USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1785

 UNITED STATES,

 Appellee,

 v.

 JOSEPH A. ROBBIO,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Mary M. Lisi, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Lipez, Circuit Judge.
 
 
 
 
 
 Barry S. Pollack with whom Timothy C. Blank and Dechert Price
& Rhoads were on brief for appellant.
 Donald Campbell Lockhart, Assistant United States Attorney,
with whom Margaret E. Curran, United States Attorney, was on brief
for appellee.

August 2, 1999

 
 
 CAMPBELL, Senior Circuit Judge. Joseph Robbio appeals
from his conviction in the district court on one count of
conspiracy to transport counterfeit securities, 18 U.S.C. 371,
2314; one count of possession of implements for making counterfeit
securities, id. 513; one count of production of false
identification documents, one count of possession of false
identification documents, and one count of possession of document-
making implements used in production of false identification
documents, id. 1028; and two counts of transporting counterfeited
securities, id. 2314. Robbio argues that the court failed
properly to instruct the jury as to how it should evaluate the
testimony of a co-defendant who cooperated with the government. He
also contends that the district court erroneously calculated his
sentence. We affirm both the conviction and the sentence.

 I. FACTS
 We state the facts in a light most favorable to the
jury's verdict. See United States v. Gaines, 170 F.3d 72, 75 (1st
Cir. 1999).
 Around December 1995, Robbio embarked on a counterfeiting
scheme headquartered in the basement of his home in Cranston, Rhode
Island. Using the names and addresses of people with obsolete
checking accounts, Robbio created counterfeit checks and driver's
licenses with equipment located in his basement. He and three
coconspirators used the counterfeit materials at retail chain
stores in New England that provided cash refunds for returned
purchases under $200. They repeatedly purchased less than $200 of
merchandise, paid with counterfeit checks that were verified by
counterfeit driver's licenses, and then returned the goods for cash
refunds before the checks bounced. Until the scheme was
interrupted in July, 1997, Robbio and his coconspirators passed
more than 700 counterfeit checks possessing a total face value of
more than $115,000. 
 In March, 1997, Robbio recruited Victor Kiendra to assist
him. He explained the counterfeiting scheme to Kiendra and asked
him to execute it at several New England chain stores. In
exchange, Robbio offered to share with Kiendra fifty percent of the
profits from each store Kiendra defrauded, the same arrangement
Robbio had with his two other coconspirators. From March to July,
1997, Kiendra helped Robbio execute the scheme in Rhode Island,
Massachusetts, New Hampshire, and Connecticut. 
 Kiendra was arrested on July 18, 1997, for failing to pay
outstanding traffic citations. The Fall River Police discovered
some of the counterfeit licenses in Kiendra's possession and
contacted the United States Secret Service. Kiendra immediately
agreed to cooperate with the government. On the day of his arrest,
Kiendra placed a monitored, recorded telephone call to Robbio. 
 During the telephone conversation, Robbio made several
references to the counterfeit check scheme. When Kiendra told
Robbio that the police had not found "those other things," Robbio
responded, "You're lucky. . . . Oh my God, you would have been
spending the weekend in jail if you had those." When Kiendra said
he would call Robbio later in the week because he had to "take a
little time off," Robbio replied, "Yeah, I know. I'll go with ya.
. . . We'll go to Caldor's . . . I'm gonna lay off those other
places. . . . If you lay off, maybe we can still make a grand here
or there around Christmas time ya know?" Five days later, Kiendra
placed a second monitored, recorded call to Robbio. In that
conversation, Robbio told Kiendra, "I'll get everything ready for
tomorrow. . . . We'll hit some Caldor's. We'll try some new
spots." Recordings of these conversations were introduced into
evidence at Robbio's trial.
 The day after the second phone call, government agents
executed a search warrant at Robbio's home, located at 1149
Narragansett Boulevard in Cranston. They discovered and seized
several items in the basement that had been used to execute the
counterfeit check scheme: two computers with check-making programs;
special pre-printed paper used for making checks, located next to
one of the computers; hundreds of counterfeit checks; a manual
describing how to create checks; counterfeit driver's licenses with
the photographs of Robbio, Kiendra, and another coconspirator,
Steven LaFazia; partially completed counterfeit driver's licenses;
two laminating machines; a Polaroid camera; and a guide to the
driver's licenses of the fifty states. The agents also searched a
car that was parked in the driveway and registered to Robbio. 
Inside the vehicle, they found and seized a bag from T.J. Maxx
containing merchandise, a receipt, and several personal checks. 
The foregoing items were introduced into evidence at Robbio's
trial.
 On October 16, 1997, Kiendra entered into a plea
agreement with the government in which he pleaded guilty to one
count of conspiring to transport counterfeited securities and
agreed to testify for the government at Robbio's trial. In
exchange, the government dismissed the remaining counts against him
and sought a reduced sentence. At Robbio's trial, Kiendra
testified that Robbio had recruited him into the counterfeit
scheme, provided him with the counterfeit checks and licenses, and
accompanied him on many trips to retail stores. He also testified
that between March and July of 1997, he personally executed the
scheme "a couple of hundred times" and passed approximately $39,000
in counterfeit checks. In addition to Kiendra, the prosecution's
witnesses included the government agents who executed the search
warrant and analyzed the physical evidence, recordkeepers for the
stores that were defrauded, and a victim of the counterfeit check
scheme.
 Robbio elected not to testify or call witnesses in his
defense. Based upon his cross-examination of Kiendra, Robbio's
counsel argued to the jury that the government's case depended
entirely on the unreliable testimony of a single witness. Robbio
maintained that Kiendra had masterminded the check scheme and "set
up" Robbio by using Robbio's basement as the center of operation. 
Robbio further argued that Kiendra testified falsely against him in
order to reduce his own sentence. 
 Following a two-day trial, the jury returned a guilty
verdict on all seven counts of the indictment. The district court
sentenced Robbio to 48 months of imprisonment.

 II. ANALYSIS
A. The Jury Instructions
 Robbio challenges his conviction on the grounds that the
district court incorrectly instructed the jury as to how it should
evaluate Kiendra's testimony. Without defense objection, the court
instructed the jury inter alia as follows:
 
 You have heard testimony from a Government witness,
 Victor Kiendra, who pleaded guilty to charges arising out
 of the same facts as this case. You are instructed that
 you are [to] draw no conclusions or inferences of any
 kind about the guilt of the defendant on trial from the
 fact that a prosecution witness plead guilty to similar
 charges.
 
 A witness' decision to plead guilty was a personal
 decision about his own guilt. It may not be used by you
 in any way as evidence against or favorable to the
 defendant here on trial.
 
 Robbio maintains that, even without a defense request,
the district court should have included a cautionary instruction to
exercise "greater care" when assessing the credibility of a
cooperating codefendant witness. See United States v. Fernandez,
145 F.3d 59, 62 (1st Cir. 1998). Robbio further contends that the
district court compounded its error by instructing the jury that it
could not consider Kiendra's guilty plea as evidence favorable to
Robbio. Neither of these contentions warrant reversal of Robbio's
conviction.
 Because Robbio made no objection to the given
instructions nor requested the "greater care" instruction, we
review only for plain error. See Fed. R. Crim. P. 52(b); United
States v. Olano, 507 U.S. 725, 732 (1993). For such an error to
exist, it must indeed be "plain" or "obvious," and it must "affect
substantial rights"; that is, "[i]t must have affected the outcome
of the district court proceedings." Fernandez, 145 F.3d at 63
(quoting Olano, 507 U.S. at 734). Additionally, an appellate court
will remedy such an error only if it appears that it "seriously
affected the fairness, integrity, or public reputation of judicial
proceedings." Id. at 63.
 This court has held that a district court need not give
an unrequested cautionary instruction as to the jury's acceptance
of a coconspirator's testimony where the testimony "looks
internally consistent and credible,'" even if the testimony is
uncorroborated. Id. at 62 (quoting United States v. House, 471
F.2d 886, 888-89 (1st Cir. 1973)). Kiendra's testimony was,
overall, internally consistent and credible. Robbio points out
only one instance of a purported internal inconsistency: at trial,
Kiendra initially denied possessing keys to Robbio's residence,
only to admit upon further questioning that he did briefly possess
them once, while Robbio was away on vacation. The admission,
however, might be considered as little more than a clarification of
Kiendra's earlier statement; it did not detract significantly from
the consistency and credibility of his testimony as a whole. 
Kiendra's testimony was not, moreover, uncorroborated. It was
supported by a considerable body of other evidence, such as the
highly inculpatory items seized from the basement of Robbio's home
and his car, and the two recorded telephone conversations in which
Robbio stated his intention to execute the scheme at some Caldor's
stores. Thus, the district court's omission of the unrequested
"greater care" instruction fell well short of amounting to plain
error. 
 Robbio also insists that it was plain error for the court
to state that the jury could not use a witness' decision to plead
guilty "in any way as evidence against or favorable to the
defendant." [Emphasis supplied.] Robbio points out that, in
assessing the credibility of Kiendra's testimony, the jury was
entitled to weigh the fact that Kiendra was testifying pursuant to
a contingent plea agreement. The jury, he suggests, might have 
interpreted the challenged instruction as denying it the right to
consider whether Kiendra's plea agreement, premised on testifying
for the government in return for a reduced sentence, affected the
truthfulness of his testimony against Robbio. Given, however, the
court's other instructions, and the fact that the effect of the
plea agreement on Kiendra's credibility was discussed extensively
at trial, we doubt that the challenged language (which related
narrowly to "a witness' decision to plead guilty" and to the fact
that it was "a personal decision about his own guilt") was intended
by the court, or was likely construed by the jury, as denying the
jury the right to assess Kiendra's credibility in light of his own
plea agreement. 
 Jury instructions must be gauged "in the context of the
charge as a whole, not in isolation." United States v. Boylan, 898
F.2d 230, 244 (1st Cir. 1990). Shortly before its instruction
concerning Kiendra's guilty plea, the district court stated:
 In evaluating the testimony of witnesses you may consider
 several things. The opportunity of the witness to have
 acquired knowledge of that which they testified to, their
 conduct and demeanor while testifying, their interest or
 lack of interest, if any, in the outcome of this case,
 whether they've been convicted of a felony, their
 intelligence or lack thereof, and the probability or
 improbability of the truth of their testimony.
 
(Emphasis supplied). This instruction conveyed to the jury that it
could consider Kiendra's interest in the case and his criminal
history when assessing his testimony. Moreover, Kiendra's plea
agreement was introduced into evidence, and Robbio's counsel cross-
examined Kiendra extensively about the terms of that agreement and
Kiendra's motivation to testify against Robbio. The government at
no time questioned Robbio's entitlement to pursue such a line of
inquiry at trial, or to argue, as he did, that the plea agreement
diminished Kiendra's credibility.
 Finally, the case against Robbio was very strong, wholly
apart from Kiendra's testimony: the items found in the basement of
his home and in his car; the testimony of other witnesses,
including a victim of the counterfeit check scheme and government
agents who executed the warrants and analyzed the evidence; and the
two recorded telephone conversations in which Robbio stated his
intention to continue the counterfeiting scheme. Even supposing it
is possible to read the challenged instruction as erroneously
inhibiting the jury's scrutiny of the plea agreement for
impeachment purposes, we doubt it reached the level of plain
error. We see little reason to suppose either that the parties or
jury interpreted this at most ambiguous instruction in the
prejudicial manner now asserted or that it had any effect on the
outcome of the case.
 B. Sentencing issues
 1. Intended Loss
 At sentencing, the district court increased Robbio's base
offense level by eight levels based upon a loss calculation of
$237,485. See U.S.S.G. 2F1.1(b)(1) (eight-level increase for
loss between $200,000 and $350,000). That figure comprised actual
loss in the amount of $115,985, representing the total face value
of the 714 counterfeit checks passed by Robbio and his
coconspirators, as well as intended loss in the amount of $121,500,
representing the 750 blank checks found during the execution of the
search warrant. Robbio contends that the court clearly erred by
considering losses from wrongdoing that he did not intend to commit
immediately, but rather might have considered committing at a point
several months in the future.
 We review a district court's intended loss findings for
clear error. United States v. Rizzo, 121 F.3d 794, 803 (1st Cir.
1997). The sentencing guidelines provide that if the loss that the
defendant intended to inflict can be determined, "this figure will
be used if it is greater than the actual loss." U.S.S.G. 2F1.1,
comment (n.8). The loss "need not be determined with precision";
rather, the district court's reasonable estimate will suffice. Id.
at n.9. 
 We will uphold an intended loss determination "where
there is good evidence of actual intent and some prospect of
success . . .". United States v. Egemonye, 62 F.3d 425, 428 (1st
Cir. 1995). Strong evidence supports the district court's
determination that Robbio intended to create and pass additional
counterfeit checks: notably, the package of blank check paper found
next to the computer in Robbio's basement; his statements in the
recorded telephone conversations that he and Kiendra would "go to
Caldor's" and "hit some Caldor's"; and his statement in the second
conversation with Kiendra that he would "get everything ready for
tomorrow." 
 There is ample evidence as well of Robbio's prospect of
success had he not been arrested. He and his coconspirators had
already executed the scheme more than 700 times before they were
interrupted. The court properly weighed the past losses inflicted
by the conspiracy in calculating the intended loss. See 2F1.1,
comment (n.9) (district court's estimate of intended loss may be
based on the approximate number of victims and average of loss to
each victim). Accordingly, we perceive no error in Robbio's
sentence enhancement for intended loss.
 2. Refusal to depart downward
 At sentencing, Robbio requested a downward departure
pursuant to U.S.S.G. 2F1.1, comment (n.11), which states, in
relevant part, that "[in] a few instances, the loss determined
under subsection (b)(1) may overstate the seriousness of the
offense." The district court denied the request, stating, "For all
the reasons I gave in determining the appropriate loss in this
case, I simply do not see where this is one of those few instances
which the note says that the loss overstates the seriousness of the
offense." Robbio now argues that the court erroneously determined
that it lacked authority to depart downward on "grounds related to
overstated loss," including "multiple causation," "sentencing
entrapment," and "disparity in loss calculation."
 Under the long-standing rule that "a criminal defendant 
cannot ground an appeal on a sentencing court's discretionary
decision not to depart below the guideline sentencing range," we
lack jurisdiction to review a district court's decision to reject
a downward departure. United States v. Reeder, 170 F.3d 93, 109
(1st Cir. 1999). Our review of the transcript of the sentencing
hearing demonstrates that the district court fully comprehended its
authority to depart downward in an appropriate case, but denied
Robbio's motion because of its perceived lack of merit. Because
Robbio challenges the district court's exercise of discretion not
to depart downward, we do not have jurisdiction to entertain his
argument. See United States v. Field, 39 F.3d 15, 21 (1st Cir.
1994). Furthermore, most of Robbio's current arguments for a
downward departure are based on grounds he did not raise in the
district court, a fact that further forecloses our consideration of
those grounds. Id.

 3. Organizer or leader
 The district court found that Robbio was a leader or
organizer of the counterfeiting scheme, and consequently increased
his base offense level by four levels. See U.S.S.G. 
3B1.1(a)(four-level increase if defendant was an organizer or
leader of a criminal activity that involved five or more
participants or was "otherwise extensive"). Robbio contends that
this finding was not based upon sufficient evidence that he played
a leading or organizing role. 
 We review the district court's findings for clear error. 
See United States v. D'Andrea, 107 F.3d 949, 956 (1st Cir. 1997). 
The sentencing guidelines state that in determining whether a
defendant is a leader or organizer, the court should consider (1)
whether the defendant exercised decision-making authority, (2) the
nature of his participation in the commission of the offense, (3)
the recruitment of accomplices, (4) the claimed right to a larger
share of the fruits of the crime, (5) the degree of planning or
organizing the offense, (6) the nature and scope of the illegal
activity, and (7) the degree of control and authority exercised
over others. U.S.S.G. 3B1.1, comment (n.4). There need not be
proof of each and every factor for a defendant to be deemed an
organizer or leader. See United States v. Tejada-Beltran, 50 F.3d
105,111 (1st Cir. 1995).
 At sentencing, the district court found that Robbio
recruited Kiendra, directed him in executing the scheme, and took
50 percent of the revenues from the scheme. It also found that the
criminal activity was extensive, covering several states and
involving hundreds of transactions. Furthermore, evidence at trial
showed that Robbio organized the scheme from the basement of his
home, supervised two other coconspirators besides Kiendra in
passing the counterfeit checks, and collected 50 percent of their
revenues as well, regardless of whether he accompanied them to the
stores. This evidence satisfies many, if not all, of the factors
set forth above, and is more than sufficient to support the
district court's finding that Robbio was a leader or organizer of
the scheme. See United States v. Kneeland, 148 F.3d 6, 16 (1st Cir.
1998). 
 4. Prior convictions
 The district court determined that Robbio's criminal
history placed him in category III. See U.S.S.G. 5A (table). 
Robbio argues that two of his prior convictions, for trespass and
counterfeiting, should not have been considered in the calculation. 
He contends that these earlier offenses did not take place within
ten years of the unlawful conduct in the present action, which he
asserts started around March 1997. See U.S.S.G. 
4A1.2(e)(2)(criminal history category calculation includes
consideration of sentences imposed within ten years of offense). 
 Because Robbio did not assert this argument in the
district court, he has forfeited it absent, at least, a showing of
plain error. Far from demonstrating plain error, the argument
lacks merit altogether. For purposes of determining a criminal
history category under 4A1.2(e)(2), the ten-year period is
determined by the date of sentencing, not of conviction. United
States v. Perrotta, 42 F.3d 702, 703-04 (1st Cir. 1994). A review
of the pre-sentence report reveals that Robbio was sentenced on the
trespass conviction on July 15, 1987, and on the counterfeiting
conviction on November 20, 1987. Accordingly, these convictions
were properly considered by the district court in calculating
Robbio's criminal history category.
 Affirmed.