# United States Court of Appeals
## For the First Circuit

No. 11-1996

UNITED STATES,

Appellee,

v.

ROCCO P. DESIMONE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Kenneth Seiger for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

November 9, 2012

**LYNCH**, **Chief Judge**.  Rocco DeSimone, a persuasive con man operating in Rhode Island, defrauded a number of investors, most neither wealthy nor experienced in investing, in a series of schemes which used the mails.  He also laundered money he received from the fraud by buying himself a $180,000 sports car.  He freely lied to his victims about three supposedly sizzling new inventions with purportedly huge market potential, well aware that his statements were false -- and then covered his lies with more lies.  DeSimone's scheme involved the "DrinkStik," through which people in protective suits supposedly could drink; the "SONG Tube," intended for feeding patients unable to eat; and the "Disk Shield," which was supposed to protect CDs and DVDs.  All told, investors lost about six million dollars.

A federal jury convicted DeSimone of seven counts of mail fraud and one count of money laundering.  He was sentenced to 192 months imprisonment and ordered to pay $6,030,145 in restitution and to forfeit certain property.  At the time he was 58 years old.

On appeal DeSimone challenges his conviction, arguing he must be given a new trial because of errors in evidentiary rulings and a failure by the court to declare a mistrial after the admission of evidence of his escape from prison following a separate conviction on tax charges.  As to his sentence, DeSimone argues the district court incorrectly calculated the number of

victims and the amounts of forfeiture and of restitution.   His arguments lack merit.

We affirm DeSimone's convictions, deny his request for a new trial, and affirm his sentence.

## I.

DeSimone wisely does not argue the evidence was insufficient to support his conviction.   We lay out the general story to provide a context for evaluating his claims.   We describe the evidence presented at trial in the light most favorable to the jury's guilty verdict.   See United States v. Manor, 633 F.3d 11, 12 (1st Cir. 2011).

A.        Victim McKittrick and the DrinkStik and SONG Tube Frauds

In 2005, a medical doctor named Robert McKittrick invented and patented the "DrinkStik," a device meant to allow people wearing protective suits in contaminated areas to stay hydrated.   His efforts to sell the invention failed.[1]

One of McKittrick's friends, David Lindsay, was a martial arts instructor who taught private lessons to DeSimone.   Lindsay introduced McKittrick to DeSimone in 2005.   McKittrick had described the Drinkstik to Lindsay, who mentioned it to DeSimone.   McKittrick then described the invention to DeSimone during their first meeting, at DeSimone's prompting.

---

[1] Jonathan Denker, director of sales for a military and emergency equipment supplier, testified at trial that the DrinkStik could not have worked in practice.

In the spring of 2006,[2] DeSimone, McKittrick, and Lindsay met again, and DeSimone told McKittrick that he would like to take on selling the DrinkStik. DeSimone explained that his career involved selling high-value items, including paintings, to people of means to whom he had special access.

DeSimone falsely told McKittrick that he knew a man named Jimmy or Ned Johnson who was the owner of Fidelity Investments, that he and Johnson had done many art deals in the past, and that "they were very, very friendly, first name basis, you know, they went to dinner and knew each other very, very intimately." Several times, when McKittrick visited DeSimone's home, DeSimone received phone calls and told McKittrick that it was Johnson who was on the phone. DeSimone's wife, Gail DeSimone, also "[o]n more than one occasion" told McKittrick that Johnson "had been [to their house], that he was a nice guy. He was very interested in the project." None of this was true. Edward Johnson, III, is a real person who

---

[2] In 2005, DeSimone was convicted of filing a false tax return in the United States District Court for the District of Rhode Island, receiving a sentence of 27 months imprisonment. United States v. DeSimone, No. 04-80S (D.R.I. Mar. 22, 2005). He began serving his sentence that year and served six months before he was granted bail pending appeal in March of 2006. United States v. DeSimone, 424 F. Supp. 2d 344 (D.R.I. 2006). DeSimone told McKittrick and Lindsay that he had been released from prison because he had been exonerated, and that his conviction was actually his accountant's fault. DeSimone had not in fact been exonerated, and his appeal was later denied. United States v. DeSimone, 488 F.3d 561 (1st Cir. 2007). After DeSimone's return to prison, he escaped in March of 2008 for several days. The escape is discussed later.

-4-

is head of Fidelity Investments, but DeSimone had never met Johnson and Johnson knew nothing of DeSimone or the DrinkStik.

DeSimone told McKittrick that: (1) Johnson had "guaranteed him [the DrinkStik] would be sold"; (2) "Mr. Johnson was purchasing it. It was already worked out. The lawyers were already putting papers together"; and (3) "the deal was done. He had shaken hands with Johnson." DeSimone said the sale would occur by September of 2006. Though McKittrick only wanted to give DeSimone a sales commission, DeSimone insisted that he needed a one-third ownership interest in the DrinkStik to show Johnson that the project was credible.

DeSimone convinced McKittrick that he knew Johnson, and that Johnson had offered to buy the DrinkStik. On May 29, 2006, McKittrick and DeSimone entered into an agreement giving DeSimone a one-third ownership interest in the parent company holding the patent rights to the DrinkStik. DeSimone set up a company -- Falcon, Limited -- that controlled his stake in the DrinkStik. This gave DeSimone a platform to fraudulently market the DrinkStik to other "investors." DeSimone later persuaded McKittrick to transfer an additional two percent interest in the DrinkStik to DeSimone in furtherance of his scheme to sell stock in the DrinkStik, purportedly to raise operating capital.

McKittrick had also received a patent for a second invention, called the SONG Tube, that was designed to make it

easier to insert a feeding tube into patients' stomachs through their noses or mouths. After McKittrick transferred a one-third interest in the DrinkStik to DeSimone, DeSimone told him that he was also negotiating with Tyco Corporation to sell the SONG Tube. This was not true. McKittrick transferred a one-third interest in the SONG Tube to DeSimone, in reliance on this representation.

DeSimone told McKittrick that Johnson had offered $264 million for the DrinkStik and that the deal would take place in September of 2006. Just before September, DeSimone told McKittrick that the deal would be delayed because they needed to change the structure of the entities holding interests in the DrinkStik. DeSimone then told McKittrick that he had set up several meetings with Johnson. When none of these meetings took place, DeSimone claimed it was because of business that took Johnson abroad. Around Thanksgiving of 2006, DeSimone told McKittrick that a deal with Johnson was imminent, and that McKittrick needed to quit his medical residency in New Jersey and return to Rhode Island so he could sign the papers immediately if needed. Believing DeSimone, McKittrick did exactly that, to his regret.

DeSimone then informed McKittrick that the deal would close by February of 2007. But in February DeSimone said that the deal would once again be delayed because Johnson's daughter, Abigail, had been admitted to the hospital, and because of

McKittrick's failure to obtain international patent protection for the DrinkStik.

DeSimone had McKittrick make presentations about the DrinkStik to Raytheon Corporation, purportedly to bid up the price by creating competition with Johnson. Raytheon never offered to purchase the Drinkstik.

DeSimone conceded at trial that Edward Johnson, III, the chief executive officer of Fidelity Investments, had never met DeSimone, did not know who DeSimone was, and had never socialized or spoken with DeSimone or been to DeSimone's house. DeSimone also stipulated that he never spoke with anyone at Fidelity Investments concerning the DrinkStik.

B.      The DrinkStik Fraud and Victims Lindsay and His Circle

After DeSimone acquired his one-third interest in the DrinkStik, he asked Lindsay -- who was struggling financially and caring for a disabled daughter -- to speak to his friends and family about investing in the DrinkStik. DeSimone told Lindsay that a sale of the DrinkStik to Johnson was imminent, likely by September of 2006. Lindsay told his family and friends about "Mr. DeSimone's connections" and that "this was a very, very good opportunity." Most of these friends and family told Lindsay that they could not afford to invest. When Lindsay reported to DeSimone that "a lot of these people, because they're all blue collar workers, they just don't have the money to go and invest in

something of this sort," DeSimone suggested that they purchase a painting and set it aside so that if the Drinkstik "doesn't sell, we'll sell the painting and then we can reimburse your friends." Based on this, some of Lindsay's friends eventually invested. DeSimone then persuaded Lindsay to take $10,000 out of his home equity line of credit to provide DeSimone with cash to purchase a Georgia O'Keefe painting that DeSimone had allegedly found in Newport. DeSimone then told Lindsay that the painting had been sent to be cared for, and later claimed that the painting had sold for $900,000. None of this was true.

Lindsay reported to his friends and family that he had purchased a painting which would protect their investments in the DrinkStik. He also relayed that DeSimone had told him that Raytheon, Tyco, and Fidelity were interested in the DrinkStik and that Johnson was a good friend of DeSimone. Based on these lies by DeSimone, Lindsay collected $100,000 from his family and friends, took out another $25,000 from his own home equity line of credit, and wrote a check for $125,000 to DeSimone. Lindsay's sister separately invested $5,000.

Around August of 2006, DeSimone falsely informed Lindsay that Johnson had agreed to buy the DrinkStik for $260 million. Lindsay then told an acquaintance, Michael Malone, that DeSimone had stated that the DrinkStik "was going to be sold shortly" for

$300 million.  Based on this, Malone invested $25,000 in the DrinkStik.

In September of 2006, DeSimone persuaded John Agostini -- who had already contributed $50,000 of the $125,000 Lindsay previously entrusted to DeSimone -- to invest another $25,000 in the DrinkStik "because it's sold" and "the more money you get in, the more money you're going to make."  DeSimone falsely told another friend of Lindsay's, Paul Gregson, that Raytheon was "very interested in purchasing" the DrinkStik and that "they had purchased the item"; he also told Gregson that he personally knew Johnson and that Johnson was interested in the DrinkStik.  DeSimone added that any investment would be covered by the purchase or acquisition of a painting.  Based on this, Gregson invested $25,000 in the DrinkStik with DeSimone.  The total sum of the investments that DeSimone fraudulently procured from Lindsay and his friends and family for the DrinkStik was $205,000.

In late 2006 or early 2007, DeSimone told Lindsay that Raytheon had offered to buy the DrinkStik for $280 million and that the closing date was February 15, 2007.  DeSimone also told Gregson, Agostini, and Malone that Raytheon had bought the DrinkStik, and that they were millionaires.  None of this was true.  Lindsay called his friends and family and related these reports of good news.  When the purported closing date of February 15, 2007 came and went, DeSimone told Lindsay, Gregson, Agostini, Malone,

and another investor, John Kilday, that Raytheon had passed on the deal at the last minute but that Tyco was now interested.

In reality, though DeSimone organized one meeting with Raytheon, no Raytheon representative ever offered to purchase the Drinkstik or discussed dollar amounts relating to a possible purchase. Similarly, though DeSimone had a phone call with a Tyco representative, Tyco never expressed interest in buying the DrinkStik or SONG Tube.

C.      The Disk Shield Fraud and Lindsay Group Victims

In May or June of 2006, DeSimone told Lindsay that, along with his accountant, Ronald Rodrigues, he owned the "Disk Shield," an invention that purportedly protected CDs and DVDs from scratching. DeSimone falsely told Lindsay that Nintendo and Sony were interested in buying the Disk Shield. DeSimone also told Gregson that he, DeSimone, was part owner of the Disk Shield, and that Sony had already purchased it. DeSimone asked both Lindsay and Gregson if they would be interested in investing in the Disk Shield; each agreed and transferred $10,000 to DeSimone.

DeSimone falsely told Lindsay that the Disk Shield had sold to Nintendo for $11 million and that the deal would close in January of 2007. DeSimone then claimed that complications with the corporate structure holding the interest in the Disk Shield had delayed the closing, and that the "money was in OFAC [U.S. Office of Foreign Assets Control]." Ultimately, DeSimone told Lindsay

-10-

that the Nintendo deal did not close because "Ron Rodrigues messed up the paperwork."

In reality, DeSimone had no stake in the Disk Shield; it was wholly owned by Rodrigues and its inventor, Paul F. Schwab. Nintendo had no record of any communications with DeSimone, Rodrigues, or Schwab regarding the Disk Shield, and neither Nintendo nor Sony ever offered to purchase the Disk Shield. In fact, no company ever offered money for the Disk Shield.

D.    Other Victims of the DrinkStik and SONG Tube Frauds

In September of 2006, DeSimone described the DrinkStik and the SONG Tube to Frederick Weissberg, a California dealer in ancient Japanese swords. DeSimone falsely said that Raytheon was "ready to buy [the DrinkStik], it was a done deal," and that Raytheon would pay more than $400 million for the invention at a closing date in early 2007. DeSimone said he was also "very good friends" with "Jimmy Johnson, who was the head of Fidelity,"[3] and that Johnson was "ready at a moment's notice to write a check for $160 million." DeSimone falsely told Weissberg that he was in talks with Tyco about the SONG Tube, and later stated that though

_____

[3] In 2004 or 2005, DeSimone had set up a three-way telephone conversation between Weissberg, DeSimone, and "Mr. Johnson of Fidelity" wherein "Johnson" discussed purchasing a $500,000 sword from Weissberg. The phone number that Weissberg used to contact "Johnson" actually belonged to Florian "Al" Monday, a friend of DeSimone's.

-11-

discussions with Raytheon about the DrinkStik had "stalled because of patent problems," Tyco was "very interested" in the DrinkStik.

DeSimone told Weissberg that a one-percent interest in the DrinkStik would cost $200,000, but that the pay-out would be $4 million. Weissberg, his brother, and a friend of his ultimately invested $600,000 in cash in the DrinkStik, after Weissberg told his brother and the friend that this was "a done deal," that it was "going to fund," and that "it was a fantastic, wonderful deal." Weissberg also sent DeSimone three swords worth more than $600,000 and forgave two sword-related debts on the understanding that these objects and debts would be credited to his investment in the DrinkStik. Weissberg believed that his investment also gave him an interest in the SONG Tube.

In late May or early June of 2007, DeSimone told Andrew Quirt, a Minnesota dealer who sold Japanese swords and art, "that there were several exciting inventions that he was going to make a great deal of money on." DeSimone told Quirt that he had a controlling interest in the DrinkStik and that an agreement with Raytheon to purchase the DrinkStik was in the works, that the sale of the DrinkStik was imminent, and that it was already in the hands of Raytheon's attorneys. DeSimone invited Quirt to invest in the DrinkStik, and Quirt, based on DeSimone's false representation, decided to invest by sending DeSimone three swords worth roughly

$500,000. DeSimone told him that this investment would net him a return of $4.4 million.

In October of 2006, DeSimone told Allan H. Dyer, a retired businessman from Indianapolis, about the DrinkStik. DeSimone said that Raytheon "was highly interested in purchasing it" and that he expected a deal with Raytheon to close in January of 2007, making each percentage of stock in Falcon, Limited -- the entity holding DeSimone's interest in the DrinkStik -- worth $2.5 million. When DeSimone asked Dyer to invest money in the DrinkStik, Dyer refused. However, Dyer agreed to exchange an oil painting by Pierre-Auguste Renoir, "Paysage a Cagnes," for one percent of Falcon, Limited, and to forgive debts amounting to $2.415 million for another two and a half percent of Falcon, Limited.

In early 2007, DeSimone told his chiropractor, Robert Marzilli, about the DrinkStik; he said that Tyco and Raytheon were interested in the invention, and that "it was going to be sold very quickly." DeSimone asked Marzilli to invest in the DrinkStik at a price of $50,000 per share, but Marzilli could not afford this amount. DeSimone then brought the price down to $25,000 per share, and Marzilli told his mother about the invention and she agreed to invest. When Marzilli expressed reservations about investing to DeSimone, stating that the money was not coming from him but from his mother, DeSimone assured him that "it was a done deal" and that

-13-

he was "a hundred percent sure."  Marzilli agreed to invest in the DrinkStik and gave DeSimone a check for $25,000.

E.	DeSimone's Use of the Mails

DeSimone sent investor questionnaires and subscription agreements through the mail to many of the investors in the DrinkStik.  Many of these investors returned these documents to Rodrigues, DeSimone's accountant, by mail.  The subscription agreement explained that any investment in the DrinkStik carried a high degree of risk; when Agostini hesitated to sign the subscription agreement, DeSimone told him that if he did not sign, he would not "get [his] money."

F.	DeSimone's Re-Incarceration and Escape

In July of 2007, DeSimone returned to prison to complete the remainder of his sentence for filing false tax returns.  In August of 2007, suspecting that DeSimone was orchestrating a scam, McKittrick and Lindsay went to the FBI to offer cooperation in investigating DeSimone.  On March 13, 2008, FBI agents executed a search warrant at DeSimone's home, searching for items relating to the DrinkStik and Disk Shield.  DeSimone's wife, Gail, was home during the search.  As the search was going on DeSimone called her on the phone.  Gail explained to him that FBI agents were at the house, searching for materials relating to the DrinkStik and Disk Shield.

Two days later, Gail visited DeSimone at prison. DeSimone used this visit to escape. He "left with her," though he understood that he was "not allowed to do that."[4] At that time, DeSimone had nine months remaining on his sentence. DeSimone traveled from New Jersey, where he had been incarcerated, to Rhode Island, Connecticut, Massachusetts, and New York before turning himself in; he spent three-and-a-half days at large. DeSimone testified that he escaped from prison because he feared for his family's safety based on threats purportedly made by McKittrick and Lindsay.[5] DeSimone admitted, however, that McKittrick and Lindsay had not spoken to Gail since November 9, 2007. Moreover, in the course of his flight DeSimone had Gail return to their home, though McKittrick and Lindsay knew its location. DeSimone also testified that during his flight, he traveled to New York to inquire about whether some of his paintings had been sold and whether he could obtain the proceeds. DeSimone turned himself in after he learned that the paintings had not been sold. He was returned to prison and was prosecuted on a charge of escape in the District of New Jersey, where he pled guilty on July 29, 2008.

_____

[4] DeSimone was incarcerated at a minimum security facility at which headcounts were the main mechanism for preventing inmates from escaping. DeSimone disappeared from the facility between two of these counts.

[5] McKittrick and Lindsay denied making any physical threats to Gail DeSimone.

G.        Financial Details of the DrinkStik Scheme

At trial, an IRS special agent, Troy Niro, testified that DeSimone procured (1) $1,236,250 in cash, (2) over $2.7 million in forgiven debts, and (3) physical assets worth $2,073,500 by selling stock in the DrinkStik.[6]  During the same period, DeSimone's expenditures were $1,451,717, of which only $28,481 were expenses related to the DrinkStik.  Records did not reveal any purchase of a painting that could have covered investments in the DrinkStik. DeSimone conceded at trial that "[n]o one's gotten any money back from the DrinkStik."

## II.

On March 11, 2009, a federal grand jury indicted DeSimone on nine counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of money laundering in violation of 18 U.S.C. § 1957(a), (b)(1)-(2).  The indictment alleged that DeSimone "knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property from individuals interested in investing in new inventions, including the Drink Stik, Song Tube and Disk Shield inventions, by means of false and fraudulent pretenses, representations, and promises."

---

[6] In its brief the government states that the SONG Tube "was a small aspect of the scheme," and the SONG Tube scheme did not generate any independent investments.  DeSimone raised $20,000 from the Disk Shield fraud and returned this amount to Lindsay and Gregson.

On January 5, 2010, DeSimone pled guilty to the charges against him, but he then changed his mind. The district court granted DeSimone's motion to withdraw his plea on September 13, 2010. On March 1, 2011, the day before his trial was to commence, DeSimone moved to exclude (1) his 2008 conviction for escape; and (2) "testimony with respect to Disk Shield . . . because there's no mail fraud. There's no allegation of a mailing involved in any alleged false pretenses with respect to Disk Shield." The district court denied both motions.

DeSimone's jury trial lasted from March 2, 2011 until March 16, 2011, when the jury returned a verdict of guilty on seven counts of mail fraud and the one count of money laundering. The jury acquitted DeSimone on two counts of mail fraud relating to Dennis Mortimer and David Durning.

The district court ordered DeSimone to forfeit a painting by Renoir that Dyer had transferred to DeSimone in exchange for DrinkStik stock, though DeSimone argued that he had owned half of the painting before Dyer's DrinkStik investment, and that he should only be liable in restitution for the half of the painting that Dyer transferred in exchange for the DrinkStik stock.

At sentencing, the court adopted the presentence investigation report without change and found, inter alia, that the offense involved ten or more victims and thus warranted a two-level increase to DeSimone's offense level. The court sentenced DeSimone

to a total term of 192 months imprisonment.  The court also ordered DeSimone to pay restitution in the amount of $6,030,145.00, which included $3,230,000 in losses suffered by Dyer.  DeSimone timely appealed on July 29, 2011.

III.

DeSimone advances an array of challenges to his conviction, forfeiture order, sentence, and restitution order.  We start with his claims of evidentiary and trial error.  "We generally review preserved evidentiary errors for abuse of discretion."  United States v. Meises, 645 F.3d 5, 20 (1st Cir. 2011).  "[T]o the extent that a claim of evidentiary error has not been preserved -- that is, when no timely and pointed objection was advanced below -- our review is only for plain error."  United States v. Sampson, 486 F.3d 13, 42 (1st Cir. 2007).

A.        Alleged Evidentiary and Trial Error

1.     The Disk Shield Evidence

We quickly dispose of DeSimone's claim that all evidence as to the Disk Shield was extrinsic to the charges and should have been excluded as impermissibly prejudicial evidence of other crimes under Fed. R. Evid. 404(b)(1) and 403.  Evidence intrinsic to the crime for which the defendant is charged and is on trial is not governed by Rule 404(b).  United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005).  Since the indictment expressly charged that the Disk Shield scheme gave rise to DeSimone's mail fraud, evidence

relating to this scheme is not other crimes evidence and it does not fall within the scope of Rule 404(b).

DeSimone also argues the government failed to prove the Disk Shield scheme used the mails, rendering evidence pertaining to the scheme inadmissible. He is wrong for a number of reasons. First, the Disk Shield was part of an overall fraudulent scheme to promote investment in new inventions to a group of investors through a series of lies. It is clear that the mails were used in the overall scheme, especially as to the DrinkStik. The government did not need to show as well use of the mails particular to the Disk Shield. The government need only prove that use of the mails was "'incident to an essential part of the scheme' or 'a step in the plot,'" United States v. Stergios, 659 F.3d 127, 133 (1st Cir. 2011) (quoting Schmuck v. United States, 489 U.S. 705, 710-11 (1989)), not that it was involved in every step of a particular scheme. Further, whether the sum of the evidence showed the Disk Shield scheme used the mails is unrelated to whether evidence of this scheme was admissible at trial.

DeSimone finally argues that the Disk Shield evidence was needlessly cumulative and should have been excluded under Rule 403. This argument is without merit. The Disk Shield evidence, pertaining as it did to a mail fraud scheme expressly charged in the indictment, was plainly relevant and neither unfairly prejudicial nor needlessly cumulative. And even if the Disk Shield

fraud had not been charged, this evidence also demonstrated DeSimone's modus operandi in duping victims.

### 2. Evidence of DeSimone's Escape and Conviction for Escape

DeSimone next challenges the admission of evidence regarding (1) his 2008 escape from prison and his flight, and (2) his conviction for that escape.[7]

"As a precursor to admissibility [of evidence of flight], the government must present sufficient extrinsic evidence of guilt to support an inference that a defendant's flight was not merely an episode of normal travel but, rather, the product of a guilty conscience related to the crime alleged." United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005). DeSimone argues that the government did not present sufficient predicate evidence that "DeSimone's escape was the product of a guilty conscience" concerning the mail fraud conduct. He bases his argument on the fact that he turned himself into the Marshals three and a half days after his escape, and also asserts that he escaped in order to defend himself and help his family. The government must present only "enough extrinsic evidence to furnish circumstantial badges of

---

[7] After the district court denied DeSimone's pre-trial motion in limine to exclude this evidence, it was DeSimone who brought up the fact of his prior conviction for escape during his cross-examination of McKittrick, and the fact of his escape in his cross-examination of Lindsay, all in an attempt to cast doubt on these witnesses' credibility. We need not reach the government's argument that as a result DeSimone waived this argument under Ohler v. United States, 529 U.S. 753 (2000).

guilt." Id. at 117.  Given that DeSimone escaped from prison two days after learning from his wife that FBI agents were searching his house, attempted to raise money during his flight and turned himself in only after these attempts failed, the trial court had an adequate foundation for finding that DeSimone's flight was the product of a guilty conscience as to these charges.  Moreover, there was overwhelming evidence of DeSimone's guilt.

DeSimone next attacks the admission of evidence of his escape under Rule 403, saying the escape evidence only went to show his purported bad character.  The district court did not abuse its discretion in concluding that the prejudice generated by evidence of DeSimone's escape did not substantially outweigh its probative value.  The court reduced the possibility of unfair prejudice by instructing the jury that "[i]ntentional flight after a Defendant is accused of a crime is not alone sufficient to prove that he or she is guilty.  Flight does not create a presumption of guilt." See United States v. Fernández-Hernández, 652 F.3d 56, 70 n.11 (1st Cir. 2011).

There was no abuse of discretion in the district court's admission of the conviction for escape and determination that the probative value of this conviction, under Rule 403, outweighed its prejudicial effect to DeSimone.  The government offered the conviction in its case in chief as evidence of DeSimone's consciousness of guilt.  It added that if DeSimone chose to testify

the conviction was also admissible under Rule 609.  For the same reasons testimony as to his escape was admissible as consciousness of guilt, the conviction was properly admitted.  See United States v. Brito 427 F.3d 53, 64 (1st Cir. 2005).  Moreover, the court minimized the prejudice to DeSimone with its instruction as to all three of DeSimone's prior convictions (including filing a false tax return and obtaining money under false pretenses) that "[t]he fact that the Defendant was previously convicted of another crime does not mean that he committed the crimes for which he is now on trial."

### 3.    Denial of DeSimone's Motion for a Mistrial

DeSimone argues that the court should have granted his motion for a mistrial because one of the government's witnesses, Louis Stein, failed to testify as the government had promised[8] when it opposed DeSimone's motion in limine.  DeSimone's theory is that but for this representation the evidence of his flight would have been inadmissible, and its admission was so harmful as to require a mistrial.  Our review is for manifest abuse of discretion. United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000).  The district court disagreed with DeSimone's contention that Stein had

---

[8] The government proffered that Stein would testify that "Rocco DeSimone told him that the reason why he fled, the reason why he escaped from prison was this case, that he didn't want to go to jail for the rest of his life."  Stein testified, instead, that DeSimone said he escaped to help his family and that he felt McKittrick was framing him in the DrinkStik investigation.

failed to testify as promised and, in any event, correctly noted that the evidence was admissible because "it's the timing of all the events that's really the critical connection between the escape and the consciousness of guilt."  Stein's testimony provided no basis to exclude evidence of DeSimone's flight, much less order a mistrial.

        4.        <u>Admission of Evidence Purported to Be Hearsay</u>

DeSimone argues there was error in admitting testimony about two statements attributed to his wife, Gail DeSimone: (1) FBI agent Steven Morley's testimony that during the FBI's search of DeSimone's home, he heard Gail tell DeSimone by telephone that agents were searching for evidence regarding the Disk Shield and DrinkStik; and (2) McKittrick's testimony that Gail told him that Johnson had been to DeSimone's house.

DeSimone incorrectly argues that these statements were hearsay.  The district court admitted Morley's testimony regarding Gail's statements not for the truth of the matter asserted, but to show that DeSimone was put on notice of the FBI search.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Figueroa</u>, 818 F.2d 1020, 1026 (1st Cir. 1987).  As to McKittrick's report of Gail's (false) statements that Johnson had visited their house, these statements were not admitted for their truth and so were not inadmissible hearsay.

-23-

### 5. Identification of DeSimone's Voice

DeSimone next claims that the court erred in allowing a witness, Brian DesMarteau, to testify that he spoke with DeSimone over the telephone when he had no prior familiarity with DeSimone's voice. Fed. R. Evid. 901 requires only a "reasonable probability," United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006), that the speaker in the conversation was DeSimone. DesMarteau testified that he was an appraiser of businesses, and that the conversation he described was "an interview to see if I would be able" to "assess the value of a particular asset that they were considering for sale." The speaker also identified himself as DeSimone to DesMarteau. The government introduced into evidence a letter agreement from DesMarteau to DeSimone and McKittrick "confirm[ing] that you (Client) have retained Nationwide Valuations (Nationwide) to provide valuation consulting services." This document, signed by DeSimone and memorializing an agreement reached in a conversation, provided adequate grounds for concluding that DeSimone was party to the conversation.

### 6. Failure of Court Sua Sponte to Declare Mistrial After a Witness's Testimony, Elicited by the Defense, that DeSimone Had Previously Pled Guilty

DeSimone claims error in the district court's failure sua sponte to declare a mistrial after Malone, on cross-examination by defense counsel, referred to the fact that "Mr. DeSimone pleaded guilty." This was a reference to DeSimone's initial guilty plea in

this case, which he withdrew.  DeSimone did not move for a mistrial before the district court.  Instead, after Malone's statement, the district court sua sponte asked counsel if they had "[a]ny bright ideas," to which defense counsel responded "[y]ou can certainly instruct the jury.  I had no idea he was going to say that.  I asked those questions I did, but I think you can instruct them."  The court then, as defense counsel requested, gave a strong instruction to the jury both to disregard the comment and about the presumption of innocence.  Defense counsel did not object.

We review the district court's failure to declare a mistrial sua sponte for plain error.  United States v. Lopez Garcia, 672 F.3d 58, 64 (1st Cir. 2012).  Here, there was no error at all.  Moreover, the district court minimized any prejudice by instructing the jury "to disregard the statement that the witness just made" and artfully implying that it related to DeSimone's "prior involvements with the criminal justice system."

7.    The Government's Cross-Examination of DeSimone

DeSimone challenges the government's cross-examination of him in two respects.  First, he argues that its cross-examination "contained numerous improper questions that had no evidentiary basis, such as asking DeSimone if he told various people, who never testified, that he knew famous celebrities, had collected additional investments, or was involved in other inventions," though he did not object to these questions at trial.  DeSimone

-25-

does not explain why these were errors, much less how he was harmed, and the record shows that he falsely claimed to have known prominent people, thus providing a basis for the questions.

DeSimone next asserts that the government "improperly asked DeSimone to comment on the credibility of other witnesses." "[I]t is improper for an attorney to ask a witness whether another witness lied on the stand." United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003). This rule is not read broadly. It is not improper to ask one witness whether another was "wrong" or "mistaken," since such questions do not force a witness "to choose between conceding the point or branding another witness as a liar." United States v. Gaines, 170 F.3d 72, 81-82 (1st Cir. 1999). There is no error in simply asking a witness if he agreed with or disputed another witness's testimony. United States v. Wallace, 461 F.3d 15, 25 (1st Cir. 2006).

In cross-examining DeSimone, the government asked him without objection whether other witnesses had offered testimony that was "untruthful," "not true," or "untrue." The government asked DeSimone whether witnesses were "giving false testimony" or testimony that was "inaccurate," and DeSimone's objections to these questions were overruled. The government correctly concedes that "[t]he instances of 'untruthful testimony' . . . and 'giving false testimony' . . . are somewhat closer to the line." Indeed, they

went over the line.  It also correctly argues that "not true" does not "necessarily imply deliberate falsity."

There was certainly no plain error as to the unobjected-to questions, and no harm from those as to which an objection was made.  Even if the government's questions intruded into the jury's role, the line of questioning was harmless.  There were obvious inconsistencies between DeSimone's testimony and that of other witnesses which were apparent to the jury.  Any error could not have "contribute[d] to the verdict," United States v. Cudlitz, 72 F.3d 992, 999 (1st Cir. 1996) (quoting United States v. Rullan-Rivera, 60 F.3d 16, 18 (1st Cir. 1996)).

The cumulative error doctrine is of no use to DeSimone because the only identified error was harmless.

B.        Attacks on the Forfeiture and Restitution Orders and Sentencing

DeSimone challenges the district court's orders on forfeiture and restitution and his sentence.  We review factual findings at forfeiture hearings and sentencing for clear error.  United States v. Reiner, 500 F.3d 10, 18 (1st Cir. 2007) (forfeiture); United States v. Shinderman, 515 F.3d 5, 18 (1st Cir. 2008) (sentencing).

1.        Forfeiture: The Ownership of the Renoir Painting

The court found that Dyer had been fraudulently induced to exchange a Renoir painting for one percent of Falcon, Limited, and ordered DeSimone to forfeit the painting.  DeSimone now asserts

-27-

that Dyer owned one-half of the Renoir and that DeSimone owned the other half, basing his argument on a declaration by Dyer that his losses included "$1,600,000 Half of Renoir painting."  He claims that he should only have been ordered to forfeit half the painting. His argument fails.

Although Dyer's declaration and his testimony created ambiguity concerning the extent of his ownership of the Renoir, the district court sensibly relied on DeSimone's own record of the transaction.  It stated that "Allan H. Dyer exchange[d] 'Paysage a Cagnes' 1915 painting oil on canvas by Pierce-August [sic] Renoir for 1% of Falcon LTD equal to 100 (one hundred) shares."  No more was needed.

### 2.    Sentencing: Number of Victims

DeSimone perfunctorily argues that the court should not have increased his offense level at sentencing based on the number of victims, since "there were only eight victims, because the jury found DeSimone not guilty on the counts (counts 2 and 5) related to Dennis Mortimer and David Durning, and the remaining individuals indicated as victims never testified."  There was no error.  A court "may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement," United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011), and a court's consideration of evidence at sentencing is not circumscribed by rules of evidence, United States v. Zapata, 589 F.3d 475, 485 (1st

Cir. 2009), or the Sixth Amendment right to confrontation, United States v. Rodriquez, 336 F.3d 67, 71 (1st Cir. 2003).

### 3.    Amount of Restitution

Finally, DeSimone asserts for the first time on appeal that the district court's restitution order is in error because it includes the value of a Monet painting that was "not an actual loss related to the mail fraud allegations."  DeSimone's premise is wrong.  While the district court did not itemize the specific losses comprising the $3,230,000 in restitution owed to Dyer, this sum plainly includes the three transactions with Dyer that DeSimone recorded -- i.e., $2,415,000 in forgiven debt, plus a Renoir that IRS agent Niro valued at $800,000 -- plus another $15,000 that Dyer gave to Falcon.  The Monet did not factor into the calculation.

### IV.

We affirm DeSimone's convictions and his sentence.