# United States Court of Appeals
## For the First Circuit

No. 02-2452

UNITED STATES OF AMERICA,

Appellee,

v.

WANJIKU THIONGO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Selya, Circuit Judge,
Stapleton,[*] Senior Circuit Judge,
and Baldock,[**] Senior Circuit Judge.

Robert L. Sheketoff for appellant.
Mark E. Howard, Assistant United States Attorney, with whom Thomas Colantuono, United States Attorney, was on brief for appellee.

September 15, 2003

---

[*]Of the Third Circuit, sitting by designation.

[**]Of the Tenth Circuit, sitting by designation.

**BALDOCK**, **Senior Circuit Judge**. A jury convicted Defendant Wanjiku Thiongo of various charges related to a two-year conspiracy to gain illegal admission into the United States for Kenyan nationals. Specifically, the jury convicted Defendant of conspiracy to commit visa fraud, in violation of 18 U.S.C. §§ 371 and 1546(a); conspiracy to encourage or induce an alien to enter, or reside, in the United States, in violation of 18 U.S.C. § 371 and 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (v)(I); and eight counts of obtaining visas for entry into the United States through fraud, in violation of 18 U.S.C. § 1546(a). After adjusting the base offense level for Defendant's aggravating role in the conspiracy, the district court sentenced Defendant to 51 months' imprisonment. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm Defendant's convictions, but remand for resentencing.

I.

The jury found Defendant procured, or caused to be procured, B1/B2 tourist visas for seventy-seven Kenyan nationals. The Kenyans' visa applications gave as the reason for travel various cultural or agricultural programs. The Kenyan nationals did not intend to attend the programs. Instead, each Kenyan intended to enter the United States and stay. Defendant charged the Kenyans between one thousand and four thousand dollars plus airfare for her assistance in obtaining entry into the United States.

Aliens may enter the United States lawfully under various types of visas tailored to the type of stay. B1/B2 non-immigrant visas are designed to permit a short term stay (usually between 30 and 60 days) for business or tourist purposes. To obtain a B1/B2 visa, an applicant must establish that he or she has a legitimate reason for travel, that the stay is temporary in nature, that the applicant has sufficient means to finance the proposed trip, and that the applicant has sufficient business or family ties in the home country to assure the United States Consular Officer of his or her intent to return.

To demonstrate a legitimate reason for travel, an applicant must provide supporting documentation. For example, an individual seeking to travel on business must provide evidence of the planned business activities such as an agenda or the names and addresses of the people with whom the applicant will be meeting. A personal interview usually is required, but may be waived if the applicant is traveling with a group for a specific purpose. In third-world countries such as Kenya, the visa denial rate is well over fifty percent because these countries historically have had a high percentage of visa recipients fail to return from the United States following entry.

The evidence at trial established that Defendant fraudulently obtained letters indicating she was planning various cultural or agricultural programs. The Kenyan nationals sought

-3-

B1/B2 non-immigrant visas, giving these events as the reason for travel and providing copies of the letters as documentation.

In September 1997, seventeen Kenyan nationals obtained B1/B2 visas from the U.S. embassy in Nairobi, Kenya to attend a twenty-one-day agricultural program at McIntosh College. Robert Decolfmaker, the President of McIntosh College, testified that he provided Defendant a letter in which he agreed to assist her in organizing an agricultural tour through the college. According to Decolfmaker, he never heard from Defendant after providing the letter, Defendant never organized an agricultural tour through the college, and no Kenyan national stayed at the college. Several of the Kenyan nationals testified that they paid several thousand dollars for a B1/B2 visa to attend the agricultural program and that they were told upon arrival that the agricultural program did not exist.

In October 1998, seventeen Kenyan nationals obtained B1/B2 visas from the U.S. embassy in Harare, Zimbabwe to attend the Boston International Festival, a one-week international exchange program for artists. Defendant obtained the visas during a visit to Zimbabwe. Five of the Kenyan nationals testified at trial that they had not completed a visa application, but had paid Defendant several thousand dollars to obtain a visa on his or her behalf. They also testified that they were not artists, and that none of the travelers intended to attend or attended the festival. Upon

-4-

their arrival in the United States, the Kenyan nationals were transported not to Boston, but to Defendant's house in Milford, Connecticut.

Also in October 1998, sixteen Kenyan nationals received B1/B2 visas from the U.S. embassy in Stockholm, Sweden to participate in a student exchange program at Price Farm School in New Hampshire. Defendant obtained the visas during a visit to Sweden. Jane Miller, the owner of the Price Farm School, testified that she provided Defendant with paperwork inviting Kenyan students to travel to the United States on a three-week cultural exchange program. After providing the paperwork, Ms. Miller did not hear from Defendant again. Defendant used the paperwork to solicit a letter of support for the visa applications from New Hampshire Congressman Charles Bass. No Kenyan national attended the Price Farm School. Several of the Kenyan nationals testified that they were not aware they were to visit the Price Farm School, that they paid Defendant several thousand dollars to obtain a visa on their behalf, and that they intended to enter the United States to stay, several joining family members that had previously entered through Defendant's assistance.

Finally, in April 1999, twenty-seven Kenyan nationals obtained B1/B2 visas from the U.S. embassy in Lusaka, Zambia to attend a multi-week dairy tour in New Hampshire and Vermont. Defendant obtained the visas during a visit to Zambia in March.

Three Kenyan nationals testified that they did not fill out visa applications, but had paid Defendant several thousand dollars to obtain visas on their behalf. They also testified that they were not dairy farmers, and that they did not visit any dairy farms in the United States.

Defendant testified in her own defense at trial. On appeal, she asserts the district court abused its discretion in admitting evidence of Defendant's prior bad acts under Fed. R. Evid. 608(b) and in permitting the prosecutor to repeatedly ask Defendant to comment on the accuracy of other witnesses' testimony. Defendant also asserts the court erred in adjusting her offense level based on her aggravated role in the offense.

II.

Defendant first contends the district court abused its discretion in permitting the prosecutor to inquire about prior bad acts. The court admitted the evidence as impeachment material pursuant to Federal Rule of Evidence 608(b). Rule 608(b) permits a party to introduce on cross-examination specific instances of conduct for the purpose of attacking the witness' credibility if the evidence is "probative of truthfulness or untruthfulness." See Fed. R. Civ. P. 608(b). The admissibility of such evidence is determined by weighing several factors including whether the instances of prior conduct bear some similarity to the conduct at issue, whether they were recent or remote in time, and whether the

evidence is cumulative of other evidence. See United States v. Simonelli, 237 F.3d 19, 23 (1st Cir. 2001). Whether to admit specific instances of conduct to impeach the credibility of a witness is a decision left to the sound discretion of the district court. See United States v. Mateos-Sanchez, 864 F.2d 232, 236-37 (1st Cir. 1988). We review the court's decision for an abuse of discretion. Id.

The prosecutor began by asking Defendant questions designed to establish that Defendant's current husband fathered her first child just a few months before she served as a legal witness in his marriage to an American citizen. The prosecutor's questions also elicited the fact that Defendant had been married to another man when she gave birth to the child. In response to defense counsel's objection, the prosecutor explained that she was attempting to establish that Defendant signed a legal document attesting to the authenticity of a marriage she knew was entered into solely for the purpose of evading immigration laws. The prosecutor asserted that Defendant had placed her credibility at issue by commenting on the testimony of other witnesses and that evidence of her willingness to assist others in evading immigration laws clearly was probative of her truthfulness. The district court agreed.

As 608(b) evidence, Defendant's willingness to serve as a legal witness to a sham marriage designed to avoid immigration

-7-

laws is fairly probative of Defendant's truthfulness. The evidence indicated Defendant willingly participated in the marriage ceremony of her current husband and another woman, a marriage her husband entered into solely to obtain a green card and eventually his citizenship.[1] The evidence further revealed Defendant obtained her own green card by later marrying the same man. Her willingness to engage in these acts shows Defendant was willing to engage in deceptive practices to avoid immigration laws. The evidence was especially relevant as it bore significant similarities to the conduct at issue in the trial.[2] The district court did not abuse its discretion in admitting this evidence.

---

[1]At oral argument, Defendant noted for the first time that the prosecutor failed to ask Defendant whether she signed the marriage license. Defendant argued that her mere participation in the marriage ceremony, absent evidence she signed the license as a legal witness, was not probative of her truthfulness. Defendant's argument challenges the prosecutor's evidence in support of her proffer rather than the district court's ruling. Defendant did not raise the matter before the district court, an act which would have permitted the Government to introduce the required evidence. Defendant also did not raise this argument in her briefs. Accordingly, we will not entertain the argument on appeal. See Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990) (arguments not made before the district court and not raised in appellant's opening brief are waived).

[2]On appeal, Defendant asserts the prior conduct was too remote to be relevant. The marriage occurred in 1981 while the conduct at issue in the trial occurred in 1998-1999. Defendant did not raise this issue before the trial court. Thus the panel would review the remoteness claim only for plain error. United States v. Gaines, 170 F.3d 72, 82 (1st Cir. 1999). As remoteness is but one factor to be considered, the district court did not plainly err in admitting the evidence despite the length of time between the prior conduct and the conduct at issue.

Evidence Defendant bore the man's child while married to another does not appear to be relevant or probative of Defendant's truthfulness or untruthfulness. The district court arguably erred in admitting this evidence.[3] But we need not determine whether the district court abused its discretion because any error in admitting this evidence was harmless. The weight of the remaining evidence against Defendant was substantial and it is extremely unlikely the verdict would have been any different absent evidence of Defendant's marital infidelity.

## III.

Defendant next asserts the prosecutor improperly asked Defendant to comment on the accuracy of other witnesses' testimony. During cross-examination, the prosecutor twice asked Defendant whether two Government witnesses were lying. Defendant did not object to the first question, but did object the second time. The district court sustained the objection, instructing the prosecutor that she could ask whether Defendant disputed the testimony, but not whether a witness was lying. The prosecutor complied with this instruction, asking Defendant only whether she disputed the

---

[3]The district court also arguably sustained Defendant's objection as to this evidence. At sidebar, the prosecutor stated she had not intended to elicit information about Defendant's marriage to another man at the time she gave birth. The district court agreed that the prosecutor "probably did not realize that she would elicit a response that [Defendant] was married to someone else." After the district court made his admissibility finding, the prosecutor did not refer again to Defendant's marital infidelity. Defendant did not request a limiting instruction.

testimony or felt a witness was "mistaken."  Defendant argues the district court erred in instructing the prosecutor she could continue asking Defendant to comment on the credibility of Government witnesses.  Defendant did not object to this instruction at trial.  Accordingly, the panel reviews this claim only for plain error.  Gaines, 170 F.3d at 82.

This Court has held it is improper for an attorney to ask a witness whether another witness lied on the stand.  Id. at 81-82 (citing United States v. Fernandez, 145 F.3d 59, 64 (1st Cir. 1998)).  Underlying this rule is the concept that credibility judgments are for the jury, not witnesses, to make.  Id. Accordingly, the district court properly sustained Defendant's objection to the prosecutor's first questions.  But this Court also has clarified that asking whether a witness was "wrong" or "mistaken" is proper because the witness is "not required to choose between conceding the point or branding another witness as a liar." Id. ("Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.'").  Thus, the prosecutor's remaining questions were permissible and Defendant's claim is without merit.  Defendant also makes no attempt to explain how the alleged error was prejudicial as required to establish plain error.

IV.

Finally, Defendant asserts the district court erred in enhancing her sentence pursuant to U.S.S.G. § 3B1.1 based on her aggravated role in the criminal activity.[4]  U.S.S.G. § 3B1.1(a) provides for a four-point offense level enhancement if the sentencing court determines a defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  To properly apply § 3B1.1, "a district court must make both a status determination–a finding that the defendant acted as a leader or organizer of the criminal activity–and a scope determination–a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guidelines."  United States v. Tejada-Beltran, 50 F.3d 105, 110 (1st Cir. 1995).  Assessing a defendant's role in the offense generally is a fact-specific task.  Id.  We review the district court's factual findings in support of the enhancement for clear error.  Id.  We review de novo the district court's legal

_____

[4]Specifically, Defendant argues the district court erred in finding Defendant organized or lead the Kenyans for whom she arranged to procure visas.  Although not well articulated, Defendant basically asserts the applicable guidelines do not permit the sentencing court to consider the aliens involved in determining whether to apply the enhancement.  Defendant developed this argument more fully before the district court in her written objections to the sentencing report and during the sentencing hearing.  The district court expressly addressed the issue during sentencing, and despite Defendant's failure to articulate her claim with precision, the Government's brief on appeal responds fully to her argument.

interpretations of the relevant sentencing guidelines. <u>United</u>

<u>States</u> v. <u>Nedd</u>, 262 F.3d 85, 93 (1st Cir. 2001).

During sentencing the district court expressly adopted

the factual findings and legal conclusions contained in the

Presentence Investigation Report. In doing so, the district court

applied the § 3B1.1 aggravating role adjustment to both the

conspiracy to induce count and the conspiracy to commit visa fraud

count.[5] But it appears from the sentencing transcript that the

_____

[5]The sentencing report calculated a total offense level of 24. In calculating Defendant's sentence, the report first grouped together the count involving conspiracy to commit visa fraud and the counts involving obtaining a non-immigrant visa by means of a false claim or statement. The report correctly used U.S.S.G. § 2L2.1 to apply a base level offense of 11. It then enhanced the sentence by 6 because the offense involved more than 25 but less than 99 documents. <u>See</u> U.S.S.G. § 2L2.1(b)(2). The report then added 4 points because it found Defendant organized a criminal activity that was otherwise extensive pursuant to U.S.S.G. § 3B1.1(a). Finally, it added 2 points for obstruction of justice. This resulted in a total offense level of 23.
    The report then calculated the offense level for the count involving conspiracy to induce an alien to come to, enter, or reside in the United States. The report correctly used § 2L1.1 to calculate a base offense level of 12. It then added 6 points because the offense involved more than 25 but less than 99 aliens. The report added 4 points pursuant to U.S.S.G. § 3B1.1 after finding Defendant organized a criminal activity that was otherwise extensive. Finally, it added 2 points for obstruction of justice. This resulted in an offense level of 24.
    Pursuant to § 3D1.2(b), the sentencing report then grouped together the two calculations. Under U.S.S.G. § 3D1.3(a), the court is to calculate the total offense level as the highest offense level of grouped counts under §3D1.2(a)-(c). Application Note 1 of that section states that "[t]he offense level for a count refers to the offense level from Chapter Two after all adjustments from Parts A, B, and C of Chapter Three." Therefore, the offense level for each offense must take into account the aggravating role adjustment under §3B1.1, separately, before the counts are grouped. After calculating the total offense level after adjustments for

district court did not intend to apply the aggravating role adjustment to the conspiracy to induce count; rather, it intended to apply the adjustment only to the conspiracy to commit visa fraud count.[6]

Application of the aggravating role adjustment to the conspiracy to commit visa fraud count was proper based on the district court's determination that Defendant organized a scheme that was otherwise extensive. The court determined that the criminal activity in which Defendant engaged was extensive in light of the "breadth of activities, when measured in terms of duration, number of clients, or geographic reach." The court also properly concluded that the aliens were criminally liable for their participation in the visa fraud and thus could be considered organized "participants" in the conspiracy. Thus, the district court properly determined that, with respect to the conspiracy to commit visa fraud count, Defendant met both the status and scope prongs necessary to apply a four-point enhancement under § 3B1.1. See Tejada-Beltran, 50 F.3d at 110-112.

---

each count, the sentencing court sentences the defendant based on the count that produced the highest total offense level. Pursuant to § 3D.3(a), the report used the highest offense level to determine the sentence, in this case 24.

[6]The district court discussed in detail the applicability of the enhancement as to both counts during the sentencing hearing. See Sentence Hearing Transcript at 3-24. The court repeatedly distinguished between the conspiracy to commit visa fraud count and the conspiracy to induce count.

But the court erred in adopting the sentencing report's recommendation to apply the aggravating role adjustment to the conspiracy to induce count.  This count is governed by U.S.S.G. § 2L1.1.  The application notes to this guideline section provide: "For the purposes of § 3B1.1 (Aggravating Role), the aliens smuggled, transported, or harbored are not considered participants unless they actively assisted in the smuggling, transporting or harboring of others."[7]  See U.S.S.G. § 2L1.1, comment. (n.2).  Applying the guideline, this Court has ruled that "in the absence of any evidence that [a defendant] exercised control over other persons or was otherwise responsible for organizing them in the commission of an offense," the mere fact that the defendant was involved in an extensive criminal activity does not support a finding the defendant was an organizer or leader under § 3B1.1.  See Tejada-Beltran, 50 F.3d at 111 (quoting United States v. Fuller, 897 F.2d 1217, 1221 (1st Cir. 1990)).  More succinctly, "Section 3B1.1 does not apply to a defendant who merely organizes or supervises a criminal activity that is executed without the aid of others."  Id. (quoting Fuller, 897 F.2d at 1221)(emphasis in the original, internal quotations omitted).

---

[7]This application note applies only to the sentencing guideline applicable to the conspiracy to induce count.  The conspiracy to commit visa fraud count, calculated under 2L2.1, contains no such instruction.

At the sentencing hearing, the court found Defendant executed the criminal activities largely on her own. The court expressly declined to apply the enhancement based on the involvement of other non-aliens in the criminal conspiracy.[8] Based on this factual finding, Defendant did not meet the status prong and did not qualify for an organizer or leader enhancement pursuant to § 3B1.1 on the conspiracy to induce count. See Tejada-Beltran, 50 F.3d at 110-112. The sentence report found Defendant to be an organizer based on the involvement of non-alien individuals. In adopting the sentence report, the district court adopted factual findings in direct conflict with its prior express findings. The court's express factual findings also conflict with its decision to impose the § 3B1.1 enhancement on the conspiracy to induce count.

---

[8]The Government argues that Defendant occupied a leadership role over numerous individuals including individuals named "Johanna" and "Wanderi." The district court expressly rejected this as a basis for applying the § 3B1.1 enhancement, noting that Defendant employed these individuals only to a "limited extent" and would have committed the same crimes in essentially the same way absent the assistance of these individuals. Specifically, the court stated: "I would not consider [Defendant] to be an organizer or leader of Wanderi or Johanna in the sense contemplated by this guideline . . . . four levels is a very significant increase in someone's criminal culpability, and her use of Wanderi and Johanna by itself doesn't warrant that big an increase in her criminal culpability." Sentence Hearing Transcript at 17-18. The district court's finding that the involvement of non-aliens in Defendant's criminal activity did not warrant a four-level enhancement pursuant to § 3B1.1 was not clearly erroneous.

For these reasons, we remand to the district court for resentencing.[9]

V.

For the reasons stated, we AFFIRM Defendant's convictions. We REMAND for resentencing in accordance with this opinion.

---

[9]We recognize Defendant's current sentence falls within the sentence range applicable upon remand. But the district court during sentencing expressed its view that a lower sentence would be appropriate. We remand to give the court an opportunity, at its discretion, to sentence Defendant as it deems just.