# United States Court of Appeals
## For the First Circuit

No. 15-1669

UNITED STATES OF AMERICA,

Appellee,

v.

NELSON PEREIRA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Thompson, Dyk,* and Kayatta
Circuit Judges.

---

James L. Sultan, with whom Kerry A. Haberlin and
Rankin & Sultan were on brief, for appellant.
Olga B. Castellón-Miranda, Assistant United States
Attorney, Criminal Division, with whom Rosa E. Rodríguez-Vélez,
United States Attorney, Mariana E. Bauzá-Almonte, Assistant
United States Attorney, Chief, Appellate Division, and Juan
Carlos Reyes-Ramos, Assistant United States Attorney, were on
brief, for appellee.

---

February 3, 2017

---

* Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**. Nelson Pereira was convicted of conspiring to possess cocaine with the intent to distribute, and aiding and abetting others to possess cocaine with the intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 846. On appeal, Pereira contends that a new trial is warranted as a result of, inter alia, the prosecutor's improper questioning that compelled him to comment on the veracity of two cooperating government witnesses, a problem that was exacerbated by improper judicial intervention in support of the prosecutor's questions. For the reasons that follow, we vacate Pereira's conviction and remand for a new trial.

## I.

Pereira does not challenge the legal sufficiency of the evidence supporting his conviction, and in such situations, there is a "lack of clear consensus in this circuit whether to recite the facts in the light most favorable to the verdict." United States v. Vázquez-Larrauri, 778 F.3d 276, 280 (1st Cir. 2015). Because the manner of review of the facts would make no difference to this appeal, we elect to present them in a neutral and balanced way.

This case stems from a conspiracy to smuggle drugs from Puerto Rico into the continental United States. The government's evidence established the following. A group led by

- 2 -

Wilfredo Rodríguez-Rosado ("Rodríguez") conspired to transport drugs and drug-trafficking proceeds in luggage onboard American Airlines ("AA") flights between San Juan, Puerto Rico, and Newark, New Jersey. Many of the co-conspirators were AA employees with baggage handling responsibilities and who had knowledge of airport security as well as access to nonpublic airport areas. Rodríguez masterminded the scheme from Puerto Rico, while Frank Prats ("Prats"), an AA employee at Newark Liberty International Airport, oversaw the Newark side of the operation.

The scheme involved packaging drugs or drug proceeds inside suitcases, smuggling these suitcases aboard AA flights, and relaying the flight information and suitcase location to conspirators at the destination airport. These conspirators would then arrange for the suitcases' unloading into the baggage claim area for pickup by other previously instructed conspirators. This conspiracy began sometime in 1999 and continued for a decade, until September 2009, when authorities arrested and indicted numerous conspirators. These arrests subsequently yielded additional evidence against other individuals who were not initially indicted, including defendant Pereira.

On March 15, 2013, Pereira was indicted for conspiring to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846, and for aiding and abetting possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Pereira, who worked at Newark Airport, was alleged to have participated in this conspiracy by orchestrating the baggage handling at Newark to ensure that the drug suitcases were properly picked up upon arrival, by giving instructions to the co-conspirators making the pickups, and by stepping in for Prats when he was unavailable to receive instructions and payments from Rodríguez.

At trial, the primary evidence against Pereira came from two cooperating government witnesses, Gerardo Torres-Rodriguez ("Torres") and Javier Olmo-Rivera ("Olmo"). These individuals had previously pleaded guilty to participating in the conspiracy. Torres's role in the conspiracy was to receive money and make payments in Puerto Rico, to relay the flight and suitcase information from Puerto Rico to the Newark conspirators (Prats and Pereira) once the flights had departed San Juan, and, on a few occasions, to fly to Newark with suitcases containing cocaine and to bring back suitcases containing money. Olmo's role in the conspiracy was to physically transport on his person

drugs or monies onboard AA flights and to prepare the cocaine for shipments from San Juan to Newark. Torres and Olmo both testified that Pereira was the right-hand man of Prats (who oversaw the Newark operations), with a crucial role in the conspiracy to ensure the smooth pickup of the drug suitcases at Newark, as well as providing and receiving instructions and payments to and from co-conspirators. Torres testified specifically that Pereira had once allowed him access to the AA locker room to exchange a bag of drug money. Olmo testified specifically that Pereira had warned a co-conspirator against picking up a drug suitcase on one occasion due to law-enforcement monitoring, and that Pereira had traveled to Puerto Rico to meet with Rodríguez to provide AA luggage tags for use in furtherance of this conspiracy.

Beside the testimony of Torres and Olmo, the government's sole evidence connecting Pereira to the conspiracy was a piece of Prats's stationery containing Pereira's first name and phone number and evidence that Pereira took an unusually short trip to Puerto Rico (supporting an inference that it was in furtherance of the conspiracy rather than a vacation). The piece of paper was found during a search of Rodríguez's house and was used to link Pereira to Rodríguez.

Given the lack of other evidence, the credibility of Torres and Olmo was crucial to the government's case.

During the trial, Pereira testified in his own defense. He admitted knowing Rodríguez and Prats as fellow AA employees, but denied participating in a drug-smuggling conspiracy with them. Pereira also denied knowing Torres or Olmo, or undertaking the actions in furtherance of the conspiracy that they had attributed to him. Pereira did admit to having taken a short trip to Puerto Rico as one of several such short vacations that he enjoyed as an AA employee who received free airfare and discounted hotel rates.

On cross-examination, the prosecutor inquired into the stark discrepancy between Pereira's testimony and Torres's and Olmo's testimony. The central question is whether the prosecutor engaged in improper conduct when he repeatedly asked whether Pereira thought Torres or Olmo had "made up" these allegations as a part of a "setup."

On April 14, 2014, the jury found Pereira guilty of "[c]onspiracy to possess with the intent to distribute five [] kilograms or more of cocaine," and "[a]iding and abetting in possession with intent to distribute five [] kilograms of cocaine," in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 846. Def. Add. 58. On May 12, 2015, Pereira was

sentenced to 151 months in federal detention, 5 years of supervised release thereafter, and a monetary penalty of $100,200.

On appeal, Pereira contends that he is entitled to a new trial because the prosecutorial questions about whether the cooperating government witness testimony was "made up" or was a part of a "setup" improperly compelled Pereira to comment on Torres's and Olmo's veracity.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review preserved objections of prosecutorial misconduct for harmless error. United States v. Carpenter, 736 F.3d 619, 630 (1st Cir. 2013). Under harmless error analysis, "[a] new trial is unwarranted so long as we are able to conclude with a high degree of confidence that the alleged prosecutorial misconduct did not affect the outcome of the trial." United States v. Smith, 982 F.2d 681, 684 (1st Cir. 1993).

## II.

We first address whether the prosecutor engaged in misconduct by asking whether Pereira thought Torres and Olmo had "made up" testimony against him as a part of a "setup." At oral argument, the government agreed that by asking the defendant whether he thought he was being "set up" by the witness or whether he thought the witness "made up" testimony about the

defendant, the prosecutor was effectively asking the defendant whether he thought the government witnesses were lying. See also United States v. Alcantara-Castillo, 788 F.3d 1186, 1192 (9th Cir. 2015) (holding that questions phrased in the form of "making that up" or "inventing stories about you" are equivalent to asking if the witness was lying).

Over the past twenty-five years, this court has consistently held that "counsel should not ask one witness to comment on the veracity of the testimony of another witness. . . . We expect that the office of the United States Attorney . . . will abide by the rule." United States v. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996) (citations and footnote omitted). Other cases, utilizing similar language, also make the same point. See, e.g., United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003) ("This Court has held it is improper for an attorney to ask a witness whether another witness lied on the stand. Underlying this rule is the concept that credibility judgments are for the jury, not witnesses, to make." (citation omitted)); United States v. Akitoye, 923 F.2d 221, 224 (1st Cir. 1991) ("[I]t is not the place of one witness to draw conclusions about, or cast aspersions upon, another witness' veracity. The 'was-the-witness-lying' question framed by the prosecutor . . . should never [] be[] posed." (citations omitted)).

This circuit is not alone in reaching this conclusion. "[M]ost of the federal courts of appeals that have examined the propriety of questions posed to a criminal defendant about the credibility of government witnesses have found that such questions are improper." United States v. Schmitz, 634 F.3d 1247, 1268 (11th Cir. 2011) (collecting cases).[1] Such "were-they-lying questions invade the province of the jury." Id. at 1269; see also United States v. Boyd, 54 F.3d 868, 871 (D.C. Cir. 1995) (holding that questions about whether another witness would "make up" testimony impermissibly infringes "on the jury's right to make credibility determinations"). These types of questions are also improper because Rule 608(a) of the Federal Rules of Evidence "does not permit a witness to testify that another witness was truthful or not on a specific occasion."[2]

---

[1] The Ninth Circuit in fact holds that asking such questions constitutes plain error. See, e.g., Alcantara-Castillo, 788 F.3d at 1192, 1195 (holding that questioning the defendant about whether a government witness was "making that up," "lying in his testimony," or "inventing stories about you" constituted plain error); United States v. Combs, 379 F.3d 564, 572 (9th Cir. 2004) (holding that forcing a defendant to call a government witness a liar is plain error).

[2] Fed. R. Evid. 608(a) provides that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Courts have held that although this rule "permits testimony concerning a witness's general character or reputation for truthfulness, it prohibits any testimony as to a witness's truthfulness on a particular occasion." United States

- 9 -

<u>Schmitz</u>, 634 F.3d at 1268. Such questions also "ignore other possible explanations for inconsistent testimony . . . [which] put the testifying defendant in a 'no-win' situation [of] . . . either accus[ing] another witness of lying or undermin[ing] his or her own version of events." <u>Id.</u> at 1269. Finally, these "were-they-lying questions are argumentative, and often their primary purpose is to make the defendant appear accusatory." <u>Id.</u> The danger is that the prosecutor first forces the defendant to label government witnesses as liars who are making up stories, and then, after laying this groundwork, seeks to convince the jury that it is the accusatory defendant—and not the prosecution witnesses—who is unworthy of belief.

In <u>United States</u> v. <u>DeSimone</u>, 699 F.3d 113 (1st Cir. 2012), this court clarified that although

> [i]t is improper for an attorney to ask a witness whether another witness lied on the stand[,] . . . [i]t is not improper to ask one witness whether another was "wrong" or "mistaken," since such questions do not force a witness to choose between conceding the point or branding another witness as a liar. There is no error in simply asking a witness if he agreed with or disputed another witness's testimony.

---

v. <u>Charley</u>, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999) (quotation marks omitted); <u>see also</u> <u>United States</u> v. <u>Pandozzi</u>, 878 F.2d 1526, 1532 (1st Cir. 1989) (explaining that Rule 608(a) bars asking a witness to evaluate another witness's veracity).

<u>Id.</u> at 127 (citations and quotation marks omitted);[3] <u>see also</u> <u>United States</u> v. <u>Wallace</u>, 461 F.3d 15, 25 (1st Cir. 2006) (same); <u>Thiongo</u>, 344 F.3d at 61 (same).

Against this background, Pereira contends that by "compelling [him] to comment on Torres's and Olmo's veracity[,] . . . each instance of prosecutorial misconduct was designed to, and did, unfairly undercut Pereira's credibility and bolster[] that of Torres and Olmo." Appellant Br. 33-34. He also argues that, under the cumulative-error doctrine, <u>see</u> <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1195-96 (1st Cir. 1993), the errors that occurred at his trial are sufficiently serious in the aggregate to warrant a new trial even if they would not necessitate such relief if viewed individually.

**A.**

We have excerpted and numbered the relevant question sets below in chronological order. While the excerpts from the testimony are lengthy, setting them out in full provides the necessary context.

---

[3] At the same time, the <u>DeSimone</u> court held that "[t]he government correctly concedes that [t]he instances of 'untruthful testimony' . . . and 'giving false testimony' . . . are somewhat closer to the line. Indeed, they went over the line." 699 F.3d at 128 (alterations in original) (quotation marks omitted).

- 11 -

Set 1 of the prosecutor's questions related to Pereira's denial of any knowledge of or connection to Torres. The prosecutor asked, on cross-examination, why, if that was the case, Torres would have had a photograph of Pereira (as Torres had earlier testified). JA 1055-59.

> Q. Do you have any idea why Gerardo Torres . . . would have this picture of you? Do you have any idea?
> A. I can't answer why, but I can answer how. . . . He went to my Facebook account, and that's my profile picture.
> . . . .
> Q. My question is: Do you have any idea why Gerardo Torres would be going to your Facebook page? . . . Do you know why?
> Defense: Your Honor, this is calling for speculation. The witness is not here. He's asking for what the other person thought, what the other person wanted. That's beyond the direct.
> Court: I don't think it's beyond the direct. I'll allow the question.
> Q. Do you? . . . . Do you have think [sic] idea why Gerardo Torres would be going to your Facebook page and getting your photo off your page?
> Defense: That's calling for speculation, Your Honor, "Do you have any idea?" That's an improper question.
> Q. Do you know why?
> Court: Do you know?
> A. The only reason why is probably to set me up.
> Q. So he set you up?
> A. Yes.
> Q. Okay. And he set you up back in 2010 prior to your arrest in this case; right?
> A. I guess.
> Q. So it was part of an elaborate plan to set you up; right?
> A. I cannot answer for him.
> . . . .
> Q. But you have no idea why Gerardo Torres would have gotten your photo other than to set you up; right?
> Defense: Objection, Your Honor. It's calling also for speculation. What ideas --

- 12 -

Court: He already said it was to set him up. Overruled.
Q. Right?
Court: Other than that reason, there's no other reason why Mr. Torres would get your picture off Facebook. That's the question. That you know of.
. . . .
A. I don't know what he was thinking.

Set 2 related to Torres's testimony that his interactions with Pereira during the conspiracy entailed calling Pereira about the flight information for the smuggled drug suitcases, and that Pereira was Prats's trusted helper in handling the drug suitcases. JA 1088-92.

Q. During the years 2001 to 2005, you never received a call from Gerardo Torres pertaining to suitcases full of drugs. Correct? That's your testimony?
A. That's correct.
Q. So this was part of Mr. Torres's setting you up when he testified about that?
A. I can't answer for him.
Q. You heard him testify about that, didn't you?
A. Yes. He wasn't telling the truth.
. . . .
Q. Okay. And when he testified that you were one of the people that Franklin Pratts [sic] put in charge of the whole suitcases -- bringing them to the carrousel, that wasn't true either; right? That's your testimony?
. . . .
A. . . . . I'm not understanding what the question is.
. . . .
Q. So the statement that he was the one who arranged the job and put people he could trust in charge of the job, you being one of them -- that's not true; right?
A. He also said I was downstairs picking up the bags, and then he also said I was upstairs helping him with the bags.
Q. So that can't be true can it; right?
A. You can't be in two places at the same time.
. . . .

- 13 -

Q. And so the statement that you were one of Frank Pratts's [sic] trusted people who could handle the suitcases full of drugs -- that wasn't a true statement; right? . . . .
A. That was not a true statement.
Q. That was not a true statement because you were not one of Frank Pratts's [sic] trusted people, were you?
A. No. I guess I wasn't one of his trusted people.
. . . .
Q. And you weren't always outside to help the person pick up the suitcase then. Right? That was another statement of Gerardo Torres. That wasn't true at all, was it?
A. The only way I could be outside picking up bags was if there was a crew chief that would allow me to get away from my assigned work so I could go upstairs and help somebody pick up bags.

Set 3 related to Torres's testimony that, to help ensure smooth pickups of the drug suitcases, Pereira would meet co-conspirators picking up the suitcases at the baggage carousel to provide further instructions. JA 1094.

Q. Because you didn't know Gerardo Torres, the fact that he met you, Frank Pratts [sic] . . . that never happened either; right?
. . . .
A. No. It did not happen.
Q. So that's not correct then. That was another thing that Mr. Torres made up; right?
Defense: Your Honor, questions as to what Mr. Gerardo Torres made up or didn't make up, it's like bringing something out.
Court: Overruled.
. . . .
Q. That's something else that Gerardo Torres made up and put against you.
A. Yes. It's a good story, but it didn't happen.

Set 4 related to Torres's testimony that on one occasion, in furtherance of the conspiracy, Pereira allowed

- 14 -

Torres and co-conspirator Camacho inside an AA locker room to exchange a bag of drug money to be smuggled to Puerto Rico. JA 1096-98.

> Q. If Gerardo Torres said that you were with Gerardo and Mr. Camacho, once again, that's another thing he's making up against you; right? Right?
> A. Can I explain that one, sir?
> Q. Is it something he's making up against you?
> Court: Is he making that up? . . . . The question is if Mr. Torres said that you were with him and Mr. Camacho, whether that's true or not.
> A. That wasn't the question he asked me. But no, that's not true.
> . . . .
> Q. . . . . [B]ut you've never seen Carlos Camacho before until you got to court; right?
> A. Correct. I never met Carlos Camacho.
> Q. So that's something he made up; right?
> A. You're answering your own question.
> Q. No. I'm asking you what the question is.
> Court: Let's not get into an argument here. The question is [if that's] something that[] Mr. Torres made up.
> Defense: But he is not the person to say that Mr. Torres made it up or not. He is not Mr. Torres.
> Court: Overruled. . . . If it's not true, then it's something Mr. Torres made up.
> A. Correct. It's a lie.

Set 5 related to Olmo's testimony that Pereira was part of the conspiracy. JA 1099.

> Q. So Mr. Javier Olmo -- [you] were also present for his testimony, sir?
> A. Yes, I was.
> Q. And once again, is he also involved in the same setup as Mr. Gerardo Torres against you?
> A. I can't say what they're--
> Defense: Objection, Your Honor. We're objecting to the setup. That's improper. We don't know what they did, but it's proper [sic] saying they were set up.
> Prosecution: I'm using his own words, Your Honor.

- 15 -

Court: He's using the witness's own language. I think the witness understands what he means.
Defense: Your Honor, this is testimony as to Olmo.
Prosecution: I'm asking him.
Court: Yes. He said it about Mr. Torres. Now the question is about Mr. Olmo, whether what Mr. Olmo said was trying to get at you. Do you know that?
A. I don't personally know that.

Set 6 related to Olmo's testimony that Prats and Pereira were known as "catchers" among the conspirators because they were the ones who would receive and unload the drugs off the airplanes. JA 1103-04.

Q. . . . [W]hen Javier Olmo described you and Frank Pratts [sic] as catchers -- do you remember when he testified about that?
A. Yes.
Q. And once again, that was something he made up; right? With regard to you.
. . . .
A. Yes. He made that up.

Set 7 related to Olmo's testimony that Pereira was the stand-in for Prats when Prats was absent, in delivering and receiving drugs and payments in furtherance of the conspiracy. JA 1104-05.

Q. And so when Javier Olmo said that you would be the deliverer of large payments in cash when Frank Pratts [sic] wasn't around, that's something he made up; right?
Defense: That's an improper question.
Court: Overruled.
. . . .
Q. And Javier Olmo said that you would be the person to deliver large amounts of cash from drugs, that was something he made up about you; right? . . . . You didn't do that; right? You didn't deliver money to

- 16 -

anybody who was a member of this drug-trafficking organization.
A. I did not do that.

Finally, set 8 of the prosecutor's questions related to Olmo's testimony that Pereira's activities in the conspiracy included delivering drug monies, communicating directly with Rodríguez, and once tipping off a co-conspirator about law-enforcement monitoring of a drug suitcase. JA 1106.

Q. And these are all things that Javier Olmo, if he said, would have had to have been made up.
A. Correct.

**B.**

The government argues that "[a]lthough defense counsel objected to" some of the questions at issue as "allegedly speculative, [defense] did not argue (as Pereira does on appeal) that the question[s] violated the general rule proscribing a lawyer from asking a witness whether another witness was lying. Thus, this objection did not preserve Pereira's argument on appeal." Appellee Br. 13 n.4 (citation omitted).

We disagree with the government that such objections did not preserve this ground for appeal at least as to question sets 3-8.

With respect to question set 1, as we discuss below in Section D, we do not decide whether the questions were improper (due to the defendant's having used the setup language in the

- 17 -

first instance). Under these circumstances, we need not address whether Pereira preserved an objection. With respect to question set 2, there were no proper objections, thus making the error unpreserved.

In question set 3, the defense objected that "Your Honor, questions as to what Mr. Gerardo Torres made up or didn't make up, it's like bringing something out." JA 1094. The objection focused on "what Mr. Gerardo Torres made up or didn't make up," which identified the problem with the prosecutor's questions. Moreover, the context of earlier objections in question set 1, particularly the objection "Your Honor, this is calling for speculation. The witness is not here. He's asking for what the other person thought, what the other person wanted," JA 1056, provided context that the defendant was objecting in question set 3 based on speculation.

With respect to question sets 4 and 5, the objections were explicit. In question set 4, the defense objected: "But he is not the person to say that Mr. Torres made it up or not. He is not Mr. Torres." JA 1098. In question set 5, the defense objected: "Objection, Your Honor. We're objecting to the setup. That's improper. We don't know what they did, but it's proper [sic] saying they were set up." JA 1099. It is clear that these objections are on the grounds that Pereira should not be

required to speculate as to whether other witnesses are making up testimony or setting him up.

In question set 7, the defense objected "[t]hat's an improper question." JA 1104. It is clear from earlier objections and the context that this was in response to a "make up" question.

Finally, the defense did not object during question sets 6 and 8 after counsel had repeatedly objected to similar questions earlier in the examination. The court "must . . . have realized [the prior objections'] applicability . . . as covering the [entire] testimony" on the issue, and the defense undoubtedly felt that "further objection would be futile" at this point. United States v. Elkins, 774 F.2d 530, 536 (1st Cir. 1985). Therefore, having objected repeatedly to "setup" and "made up" questions in these instances during cross-examination, we conclude that the defense counsel sufficiently preserved an objection based on speculation for question sets 3, 4, 5, 6, 7, and 8.

As for the sufficiency of the speculation ground for objection, the very rationale for the were-they-lying-questions rule is that witness "credibility judgments are for the jury, not witnesses, to make." Thiongo, 344 F.3d at 61. Objections that the questions asked for speculation about other witnesses,

or that Pereira "is not the person to say that Mr. Torres made it up or not," JA 1098, fit precisely within the heart of the rule's rationale. We agree that such objections suffice because the defense "demonstrate[d] . . . that the ground for the objection was obvious from the context in which it was made." Boyd, 54 F.3d at 872; see also Elkins, 774 F.2d at 536 (recognizing that when a court realizes that an objection covers the entire testimony, further objections are unnecessary).

### c.

We next consider whether the questions in sets 3–8 were improper. Each of these six sets contains questions that effectively asked Pereira whether he thought Torres or Olmo was lying—seven times in questioning the witness about Torres's testimony and six times in questioning the witness about Olmo's testimony (including the follow-up questions posed by the court). The government does not dispute that these questions violated the general rule prohibiting a prosecutor from asking a witness whether another witness was lying, and the government could hardly argue otherwise.

The prosecutor's improper questions were further exacerbated by judicial intervention that compelled Pereira to

answer.[4] For example, with respect to the issue of whether Pereira had ever met co-conspirator Camacho, the court interjected and asked directly: "The question is [if that's] something that[] Mr. Torres made up." JA 1097. The court went on to further rephrase: "If it's not true, then it's something Mr. Torres made up." JA 1098. In another example, the court expanded the prosecutor's "setup" questions about Torres to be used in the questions about Olmo. When the defense counsel objected, the court overruled, reasoning that "[y]es[,] [h]e said it about Mr. Torres. Now the question is about Mr. Olmo, whether what Mr. Olmo said was trying to get at you. Do you know that?" JA 1099. Instead of sustaining objections to improper prosecutorial questioning or issuing curative instructions, judicial intervention here seemed to have reinforced the prosecutorial misconduct.

**D.**

In response, the government makes two arguments as to why this general rule should be inapplicable here.

---

[4] Pereira contends that this judicial intervention, along with other actions of the district court, violated his due process right to a fair trial. See Appellant Br. 36–43. Given the conclusions we reach, we need not address this argument. The district court's conduct in questioning Pereira is, however, a relevant consideration in the analysis of the issues that we do reach.

First, the government argues that Pereira himself opened the door to these "setup" questions during the cross examination. This may have merit with respect to set 1, where the government asked why Torres would go into Pereira's Facebook page and obtain his photo, and the defendant answered—without inducement—that the reason was "probably to set me up." JA 1056.[5] The problem is that with respect to question sets 3 and 4, the government seized upon Pereira's answers in question set 1, and veered into asking the witness similar questions about other subjects of Torres's testimony as to which Pereira had not suggested a "setup" motivation.

Moreover, even if we were to agree with the government that "Pereira himself opened the door to the prosecutor's questions by freely testifying that Torres set him up," Appellee Br. 19, as to the questions concerning Torres's testimony, the government certainly engaged in prosecutorial misconduct when it followed up during question sets 5, 6, 7, and 8, asking whether the other government cooperating witness (Olmo) also "made up" testimony as a part of a "setup." With respect to Olmo, the

---

[5] Some cases have held or suggested that such questions may be permissible "if a defendant opened the door by testifying on direct that another witness was lying." United States v. Harris, 471 F.3d 507, 512 (3d Cir. 2006); Boyd, 54 F.3d at 871, n.* ("Had [defendant] testified on his own that the [witnesses] were lying, such questioning might be proper.").

- 22 -

government conceded that the defendant did not introduce any answers on his own that would justify such questions. See Oral Arg. 11:08–11:17 (agreeing that "[t]he defendant didn't open up that line of questioning as to Olmo."). We therefore reject the government's argument that the extension of testimony after set 1 was permissible because Pereira had opened the door.

Second, the government argues that because Pereira and the cooperating government witnesses gave directly contradictory testimony, this "left open only the suggestion that Torres and Olmo were making up stories," rather than "an interpretation that Torres and Olmo simply spoke out of mistake or hazy recollection." Appellee Br. 20, 22. Thus, according to the government, because of the clear conflict, it was proper for the prosecution to ask the defendant whether the government witnesses were lying. The government relies on two state law cases, State v. Hart, 15 P.3d 917 (Mont. 2000), and People v. Overlee, 666 N.Y.S.2d 572 (N.Y. App. Div. 1997), to support its proposed rule that where there exists a direct contradiction in testimony, this justifies asking whether another witness is lying. We decline to follow these cases. Our reasons are several.

The government does not call to our attention any federal cases that hold that a direct conflict in witness

testimony renders was-the-witness-lying questions appropriate. Quite the contrary, this court and other circuits have clearly held that such questions are improper in situations where witness testimony did directly conflict. For example, in Sullivan, we held the following exchange to be improper:

> Q: So, I take it you would deny that you ever stated to [witness] that you wished you didn't have so many people involved in the robbery? . . .
> A: I certainly do, yes.
> Q: I take it that, when [witness] testified to that, you would say he was lying? . . . I take it you would say that that was a lie, that you never said anything like that.
> A: You take that correctly, yes.

Sullivan, 85 F.3d. at 749 n.2. Similarly, in United States v. Fernandez, 145 F.3d 59 (1st Cir. 1998), we held the following exchange to be improper:

> Q: You showed the agent a roll of money you had in your pocket, didn't you, sir?
> A: No, negative.
> Q: So, [witness] who testified yesterday[,] he's lying?
> A: I don't know why he said that, but I did not show it. . . .
> Q: Sir, you did state that that place was full of Customs agents, didn't you?
> A: God, I haven't said anything like that. . . .
> Q: So, [witness] who testified yesterday that you said that is lying, right? . . . So [witness] is making all that up, right, sir?
> A: I don't know what I could say. I didn't say anything as to that matter.

Id. at 64 n.1 (second alteration in original).

In United States v. Boyd, 54 F.3d 868 (D.C. Cir. 1995), the defendant testified that he never held a bag of cocaine in his possession while two government witnesses testified that he did, which prompted the prosecutor to ask the defendant why the government witnesses would be "making this up." Id. at 37. In United States v. Harris, 471 F.3d 507 (3d Cir. 2006), "the prosecutor restated various assertions of police witnesses that directly contradicted Harris'[s] testimony and then asked Harris if it was his testimony that the police witnesses were lying." Id. at 510. And in United States v. Combs, 379 F.3d 564 (9th Cir. 2004), the government witness testified that the defendant had stated that he manufactured methamphetamine, while the defendant denied making this statement, which prompted the prosecutor to ask the defendant if he thought the government witness was "lying in his testimony." Id. at 567. In each of these exchanges, there was certainly a direct contradiction between two witnesses, and in each instance, the questioning was held to be improper.

Even where there is a direct conflict between a defendant's testimony and a government witness's testimony, asking if one of these witnesses is lying still runs counter to important policies of the rule. One of the policies behind this prohibition is to not force a witness "to choose between

conceding the point or branding another witness as a liar." United States v. Gaines, 170 F.3d 72, 82 (1st Cir. 1999). Such accusatory answers, if required, would put a defendant in a disadvantageous position in front of the jury.

> The very structure of the question is designed to pit the testifying witness against every other adverse witness, suggesting to the jury that someone is deliberately deceiving the court . . . . [T]he were-they-lying questions . . . prejudicially force the testifying defendant to accuse or not. Even worse, the defendant's answer often does not matter because the predomina[nt] purpose of such questions is to make the defendant look bad.

Schmitz, 634 F.3d at 1269. Another policy behind prohibiting such questions is "because they seek an answer beyond the personal knowledge of the witness." Id. at 1268. A witness would lack personal knowledge of "whether another is intentionally seeking to mislead the tribunal," Harris, 471 F.3d at 511, regardless of whether his or her testimony is in conflict with the other witness's. Therefore, where there is a direct conflict in testimony, important policies behind this rule are still implicated.

Finally, restricting the government from asking is-the-witness-lying questions does not unreasonably impair the government's ability to question a witness fully. We recognize that "it is often necessary on cross-examination to focus a witness on the differences and similarities between his

- 26 -

testimony and that of another witness," and this is proper if the defendant "is not asked to testify as to the veracity of the other witness." Schmitz, 634 F.3d at 1269 (quoting Harris, 471 F.3d at 512). The objective of highlighting the conflict can be achieved by "[a]sking a witness whether a previous witness who gave conflicting testimony is 'mistaken[,]' [to] highlight[] the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.'" United States v. Gaind, 31 F.3d 73, 77 (2d Cir. 1994). For example, in Gaines, when the government witnesses identified the defendant as the drug dealer but the defendant denied these allegations—a direct contradiction—this court approved of cross-examination questions where "[t]he prosecutor . . . did not . . . ask the witness whether he believed the others had lied. Instead, he asked whether the other witnesses . . . were 'wrong,' rather than 'lying.'" 170 F.3d at 81–82.

We conclude that the government's questions in this case in sets 3-8 were both extensive and improper. In these circumstances, we do not have to consider whether question set 1 was improper or whether question set 2 constituted plain error. "[W]hen there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group under harmless-

error review. If, cumulatively, they are not harmless, reversal is required." United States v. Caraway, 534 F.3d 1290, 1302 (10th Cir. 2008). As we now discuss, the preserved errors were not harmless.

### III.

"That this [was-the-witness-lying-question] rule was violated by the prosecution is not the end of the analysis. The [next] question is whether the violation of the rule was harmless." Sullivan, 85 F.3d at 750. "In deciding whether a new trial is required [] because [of] prosecutorial misconduct . . . [,] we consider the severity of the misconduct, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants." United States v. Cox, 752 F.2d 741, 745 (1st Cir. 1985); see also Sepulveda, 15 F.3d at 1182 (holding that harmless error analysis is a "case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, [and] the relative strengths of the parties' cases").

Here, the repeated and numerous occasions in which the prosecutor engaged in these was-the-witness-lying questions were surely deliberate. So too the prosecutor's repeated "setup"

questions constituted severe misconduct when coupled with judicial intervention that significantly exacerbated the misconduct (as discussed further below). There were no curative instructions for any of the improper questions. Nor was there substantial untainted evidence against Pereira.

In assessing the strength of the evidence, we look at the record excluding the improper questions and the testimony generated by those questions. See, e.g., Fernandez, 145 F.3d at 64-65 (holding that "[m]uch of the case against Fernandez rested on undisputed evidence" not generated by the improper questions, and concluding that "[g]iven the strength of the government's case, it stretches credulity to believe that the improper . . . questions affected the outcome of the trial."). Excluding the improper questions and the testimony generated by those questions, the case against Pereira was largely dependent precisely on the assessment of Pereira's credibility versus the credibility of Torres and Olmo. The testimony of Torres and Olmo, moreover, had little self-corroborating substance, and the circumstances presented a basis to infer that they had a reason to lie. The testimony of Torres and Olmo was essential and primary to the government's case. Beside their testimony, the only other evidence against Pereira was a piece of Prats's stationery found at Rodríguez's house containing Pereira's first

name and phone number and the fact that Pereira took an unusually short trip to Puerto Rico. There was no other evidence that could support a conviction. In short, this was a case in which we cannot conclude with a high degree of confidence that the improper questions and the testimony generated by those questions had no effect on the jury's assessment of the credibility battle between Pereira and the prosecution witnesses. In the context of such a case, which hinged on the outcome of a swearing contest that would well have been affected by improper questions, it is difficult to see how the improper questions in sets 3-8 could be harmless error under the prevailing test.

Nevertheless, relying on Sullivan, the government recycles the argument that the prosecutor's questions here only made clear to the jury that the opposing witness testimony was directly contradictory.

In Sullivan, the government primarily relied on testimony from two cooperating witnesses who had participated in a robbery with the defendant to convict Sullivan of armed robbery. 85 F.3d at 746-47. At trial, a secondary government witness testified that the defendant had made a tangential remark about the robbery, which Sullivan denied having said, prompting the prosecutor to ask whether Sullivan thought the

witness was lying. Id. at 749 n.2. This court held that the question was improper but harmless, because there were a total of six witnesses who testified against the defendant and the improper question only pertained to a single tangential remark made by a secondary witness, which made the court conclude that "the error was on a minor point." Id. at 750; see also United States v. Moreland, 622 F.3d 1147, 1160 (9th Cir. 2010) (holding that two witnesses "were peripheral witnesses because they testified regarding matters of minor importance to the case"). While Sullivan mentioned in passing that it "was obvious" that "there was a contradiction between [the government witness's] testimony and" the defense testimony, 85 F.3d at 750, Sullivan cannot be read to suggest that in every case the existence of directly contradictory testimony renders the questions harmless.

The government also relied on two other cases, Fernandez, 145 F.3d at 64, and United States v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007), which contained improper was-the-witness-lying questions that were reviewed under a plain error standard. In plain error review, the standard for finding an error harmless is less demanding, at least in the sense that the defendant bears the burden of showing prejudice. United States v. Olano, 507 U.S. 725, 734 (1993) (holding that the "important difference" between plain error review and harmless error review

is that, in the former, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice"); see also United States v. Gandia-Maysonet, 227 F.3d 1, 5 (1st Cir. 2000) (holding that the "main practical difference between the two standards is that plain error requires not only an error affecting substantial rights but also a finding by the reviewing court that the error has seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings" (alteration in original) (quotation marks omitted)).

Like Sullivan, Fernandez is clearly distinguishable because the court emphasized the other strong government evidence linking the defendant to his crimes. Moreover, the questions were limited in number and scope, and only pertained to tangential, corroborated testimony. 145 F.3d at 61-64. Robinson also held that such questioning was harmless. 473 F.3d at 395-96. The Robinson court discussed the directly conflicting nature of the testimony in finding an absence of prejudice from these questions. Id. at 395-96. However, like Sullivan, Robinson is distinguishable because the government had other strong evidence linking the defendant to the crime. Furthermore, there were only two improper questions, they both pertained to

tangential testimony, and an objection was sustained as to one of the two. See id. at 391-92, 395-96.

DeSimone, not relied on by the government, is also distinguishable. There, the questions concerning whether prior witness testimony was "false" or "untruthful" were held to be in error but found to be harmless. 699 F.3d at 128. While the court relied on the rationale that "[t]here were obvious inconsistencies between DeSimone's testimony and that of other witnesses which were apparent to the jury" for finding harmless error, id., the untainted evidence against DeSimone was substantial, including evidence of flight to avoid prosecution, id. at 118-123. In fact, the DeSimone court cited prior case authority recognizing that "the greater the weight of the other evidence against the defendant, the less likely it is that a given error swayed the jury." United States v. Cudlitz, 72 F.3d 992, 999 (1st Cir. 1996).

Most important from a harmless error perspective, in none of these cases (Sullivan, Fernandez, Robinson, and DeSimone) was the improper questioning nearly as extensive as it was here,[6] and in none of these cases did the district court participate in the improper questioning.

---

[6] Two improper questions were posed in Sullivan, 85 F.3d at 749 n.2, four in Fernandez, 145 F.3d at 64 & n.1, two in Robinson, 473 F.3d at 395, and two in DeSimone, Brief for Appellant at 57-

This case is far more similar to <u>United States</u> v. <u>Geston</u>, 299 F.3d 1130 (9th Cir. 2002), where even applying a plain error review, the Ninth Circuit held that permitting the prosecutor to ask defense witnesses whether they thought the government witnesses were lying was an error that required reversal. In <u>Geston</u>, the case rested on conflicting testimony, in which four eyewitnesses testified for the government and two for the defense. <u>Id.</u> at 1135–36. The prosecutor asked the two defense witnesses whether they thought the government witnesses were lying. On appeal, the court held that "it is reversible error for a witness to testify over objection whether a previous witness was telling the truth." <u>Id.</u> at 1136. The court went on to explain that "[t]his case was a close one . . . . [Defendant's] fate hinged on resolution of the conflicting testimony presented by the parties. . . . In a case where witness credibility was paramount, it was plain error for the court to allow the prosecutor to persist in asking witnesses to make improper comments upon the testimony of other witnesses." <u>Id.</u> at 1136–37 (citation omitted).

As we have discussed, witness credibility was also paramount in this trial. In his closing argument, the prosecutor

<hr>

58, <u>United States</u> v. <u>DeSimone</u>, 699 F.3d 113 (1st Cir. 2012) (No. 11-1996), 2012 WL 1572561, at *57–58.

emphasized the improper questioning by referring to the "pretty elaborate setup," and telling the jury that if it "believe[s] that [setup], then [it] can't believe Javier Olmo, and . . . can't believe Gerardo Torres. It's that simple." Add. 33–34. The government itself recognized the core credibility contest on which the case against Pereira hinged, and the important role that the "setup" questions played.

Finally, and perhaps crucially, here, as in Combs, the "prejudicial effect of the improper questioning was compounded when the district judge placed upon it [his] imprimatur." 379 F.3d at 573. In Combs, the district court "twice . . . instructed [the defendant] to answer the prosecution's question about the truthfulness of [the government witness's] trial testimony." Id. at 573–74. Here, the district court was even more actively involved than in Combs. For example, in question sets 4 and 5, the court directly asked Pereira—over objection—the improper questions that the prosecutor had been asking Pereira. Thus, the error of the improper prosecution questions was further exacerbated by judicial intervention.

The ultimate test for harmless error is that "[a] new trial is unwarranted so long as we are able to conclude with a high degree of confidence that the alleged prosecutorial misconduct did not affect the outcome of the trial." Smith, 982

F.2d at 684. Given the severity of the misconduct, the dearth of other evidence, the repeated questions by the government, the evidently deliberate nature of this conduct, the absence of a curative instruction, and the participation of the district court in these questions, we are unable to conclude with a high degree of confidence that the prosecutorial misconduct here did not affect the outcome of the trial. We therefore hold that a new trial is warranted.

## IV.

In light of our disposition, we need not address Pereira's additional objections on appeal.

**CONVICTION VACATED AND REMANDED FOR NEW TRIAL.**